Jones, Chief Judge,
delivered the opinion of the court:
In September 1947 a fire burned a portion of the Eldorado National Forest in California. The Forest Service designated it the Allen Ranch Fire, or Burn.
Ordinarily trees that have been killed, or severely burned, deteriorate rapidly. Consequently the Forest Service, on September 18, 1947, advertised an invitation for bids
*61 * * * for all the live timber marked or designated for cutting, and all merchantable dead timber in the Allen Ranch burn located on an area embracing about 1,800 acres within Eldorado National Forest, California, estimated to be approximately 10,600 M feet b. m., more or less, of ponderosa pine, sugar pine, Douglas fir and incense cedar, 70 percent pine. * * * Before bids are submitted full information concerning the timber, the conditions of sale, and submission of bids should be obtained from the Forest Supervisor, Placerville, California.
No bids had been received up to October 17, 1947. Prior to this date the Forester had talked with representatives of two box companies. After October 17, 1947, the Forester and his assistant endeavored to interest several local lumbermen and operators.
In December one of the box companies approached Theodore Rupley, one of the plaintiffs, concerning the purchase by the box company of timber to be logged by the Rupleys.
Rupley was engaged in logging operations near the property in question during November and December 1947. He learned of the fire damaged timber that was being offered for sale, and made inquiry of the Forester in his office at Placerville. At about that time he read the invitation to bid, obtained a map of the burned area and a standard form of timber sales agreement.
Rupley and the Forester met in the box company’s office. Rupley asked if any of the overmatured trees in the virgin stands would be marked for cutting, and was told by the Forester that such trees would be marked when needed to complete the logging of the area in order to obviate the necessity of further logging of high-risk trees in the burned area at a later date.
A few days later contract terms were discussed, and an agreement was reached as to a definition of the term merchantability. Other matters also were discussed. At one point Rupley asked about the volume of marketing and cutting that had theretofore been done in the cutover portions of the Allen Ranch burn and was informed that it was 65 or 70 percent of the green timber. Rupley was told also the method which the Forester had used in the estimating of timber to be removed from the Allen Ranch burn.
*62 A contract was submitted December 31, 1947. The negotiations, representations and wording of the contract justified plaintiffs’ understanding that the timber to be logged was in a fire-salvage area and consisted of fire-damaged timber, plus some high-risk trees, that it also included in the virgin stands timber to be marked, consisting of fire-damaged trees and any undamaged trees considered by the Forester to be high risk. It does not justify an interpretation that green, undamaged trees (other than high-risk trees) were to be marked for cutting, nor that cutting was to be limited to trees that were dead or dying.
An agreement was signed by plaintiff January 26, 1948, and approved by the Forest Supervisor January 30, 1948. It was on a standard Forest Service Timber Sale Agreement form, with deletions and additions agreed upon by the parties. Pertinent parts are set out in finding 15.
The agreement described the estimated amounts of the different kinds of timber and recited the total estimated amount to be cut, live and dead, as 10,100,000 board feet, more or less.
Plaintiffs were permitted to cut only 6,602,210 board feet. This was taken from the cut over areas of the land covered by the contract. Plaintiffs asked that trees be marked in the virgin stand area. In the meantime either the weather conditions in the growing season following the fire had been favorable, or the fire damage was less than either party had anticipated. At any rate, the forest supervisor declined to mark any trees in the virgin area.
Plaintiffs sue for the difference in the value of their contract based on the privilege of cutting 10,000,000 board feet and the amount they were permitted to cut. They assert that the estimate as worded in the contract amounted to a warrant and a promise, and that the defendant breached its contract in refusing to mark trees in the virgin area.
The defendant answers that the 10,100,000 board feet was purely an estimate, and that the use of the term, more or less, permitted a variation even in the amount of the estimate.
We are inclined to the view that the term more or less as used in the particular setting was intended to cover minor errors. Pine River Logging & Imp. Co. v. United *63 States, 186 U. S. 279. However, that is not the important phase of this case.
No doubt the estimate was in good faith and seemed reasonable at the time it was made. The crucial fact in the case is that the contract called for “all the dead timber standing or down and all the live timber marked or designated for cutting by a Forest officer, merchantable as hereinafter defined for sawlogs.” [Emphasis supplied.]
The contract also contained the following:
Marking — 1. Live timber shall be marked or designated for cutting as follows: Only trees of merchantable size as determined by Sections 5 and 5a herein shall be marked for utilization.
When the contract is construed as a whole there is not the slightest doubt that it was intended to include in the virgin area covered by the contract (1) high-risk trees, that is,' trees that had become fully matured, and would therefore soon tend to deteriorate, and (2) trees that had been xiiaterially damaged by fire. These the Forest supervisoi declined to have marked and declined to permit to be cut. In doing so both the spirit and the letter of the contract were breached.
There was within the unmarked virgin areas a sufficient number of trees that had suffered some fire damage when added to trees in that area which would properly be classed as high-risk trees, to have produced a total of 3,500,000 board feet in addition to the trees in the area which plaintiffs were permitted to cut.
However, as indicated, probably on account of a subsequent favorable growing season, or because the damage was less than had been anticipated, many of the somewhat damaged trees fully recuperated and in line with an over-all forest conservation policy these were not allowed to be cut.
It is fair to conclude from the evidence as a whole that approximately one-half of the 3,500,000 board feet is represented by trees that had fully recovered, and that only approximately one-half is represented by high-risk trees and substantially damaged trees in the virgin area covered by the contract. These under the terms of the contract plaintiffs had a right to expect to be marked for cutting.
*64 Plaintiffs claim a right to recover for the full amount covered by the estimate. With this position we cannot agree.
True both Rupley and the defendant expected that the full amount would be marked for cutting. But only one-half of the difference in the amount cut and the amount estimated falls within the terms of the contract.
The Forest Service has a national conservation policy. That policy is well known throughout the country. It has been developed after long years of controversy and has become the well-established policy of the country — in fact, the policy of conservation of our natural resources is known and appreciated in every hamlet within our borders. It is one of the true sources of our Nation’s strength.
Certainly the Rupleys, with their background of experience, as well as the Forest officer, knew of this policy. In the -right of this background and according to the wording of the "oQutract only substantially fire-damaged and high-risk trees im the virgin area were to be marked for cutting. The possibility that on account of favorable weather conditions, or from other natural causes, for which neither party was responsible, there would be a greater percentage of recuperation than had been anticipated, was one of the chances which the Rupleys took when they entered into the contract. For this they have no legal ground of complaint.
The plaintiffs are entitled to recover the net value of 1,750,000 board feet, or an aggregate sum of $5,390. The basis of this calculation is set out in finding 25.
It is so ordered.
Howell, Judge; Madden, Judge; Whitaker, Judge; and Littleton, Judge, concur.
FINDINGS OE FACT
The court makes findings of fact, based upon the evidence, the report of Commissioner W. Ney Evans, and the briefs and argument of counsel, as follows:
1. During the first five days of September 1947, a forest fire burned over some 1,800 acres of the Eldorado National Forest, in California. In conformity with Forest Service custom of naming each forest fire, this one was designated *65 and became known as the f ilen ranch fire (sometimes called the Allen ranch burn).
2. Trees that have been killed vz hrrnreA by -Scel may deteriorate somewhat rapidly. Salvage of dead or dying fire-damaged timber should be accomplished within a year, more or less, after the fire, to obtain the maximum merchantable salvage timber. Accordingly, the Forester in charge of timber management at Eldorado National Forest, promptly after the fire was brought under control, made a survey of the damage and began conferences with local lumbermen on means of salvaging the burned timber. It was the policy of the Forest Service, in such salvage sales, to sell only such timber as had been killed by the fire or so severely injured that its survival was unlikely. It is not established by the evidence that there had been sufficient occasion for the application of this policy in timber sales in Eldorado National Forest for it to be fully known in practice and understood among local lumbermen and logging operators.
3. Within the national forest area of the Allen ranch fire, parts, approximating one-half of the burn, had been cut over in 1943. In these cut-over segments of the area the fire damage was severe, and many trees were obviously killed or so severely injured that their survival was improbable. The remaining segments of the area contained virgin stands of timber. In these areas the damage was extensive and appeared immediately after the fire to be quite severe.
4. In the course of his survey the Forester determined the boundaries of the burned area and noted them on maps. He estimated that 50 percent of the timber in the virgin stands had been killed or so severely injured by the fire as to warrant removal.
In making his estimate of the volume of timber to be removed the Forester reviewed timber cruises that had been made in 1935 of the various parts of the area, computed the volume of timber that had been cut since the 1935 cruises, made appropriate adjustments of the cruises for merchantable sizes and for areas where the fire boundaries cut across parcels of the land, considered his estimate of 50-percent fire damage in virgin stands, made allowances for high-risk trees to be removed whether fire damaged or not, and estimated *66 the amount of timber to be remorad at 10,600,000 feet, board measure, comprised of 5.500,000 feet of ponderosa pine, feet «¡F «Egssir-pine, 2,300,000 feet of Douglas fir, and 700,000 feet of incense cedar.
The volume of timber warranting removal by Forest Service standards and worthy of salvage as merchantable logs after a forest fire in the fall of the year cannot then be estimated within narrow limits of accuracy. The estimate made by the Forester in this instance was competent, workmanlike and reasonable. Plaintiffs knew that the estimate could not be made within narrow limits of accuracy, and agreed, when apprised of the Forester’s estimate, that it was reasonably made.
5. The Allen ranch burn was less than 25 road miles from Placerville, California, at which were located the headquarters of the Eldorado National Forest and the plaintiffs’ principal place of business. Plaintiffs are citizens of the United States engaged in logging as a copartnership, doing business as Rupley Brothers. The Mountain Democrat was a newspaper of general circulation published at Placerville.
6. On September 18,1947 (and again on September 25 and October 2), there was published in the Mountain Democrat by the Forest Service the following invitation for bids:
NATIONAL FOREST TIMBER FOR SALE. Sealed bids will be received by the Forest Supervisor, Placerville, California, up to and including October 17, 1947, for all the live timber marked or designated for cutting, and all merchantable dead timber in the Allen Ranch burn located on an area embracing about 1,800 acres within Sections 3, 4, 8, 10, 16, 17, & 20, Township 12 North, Range 11 East, and Section 34, Township 13 North, Range 11 East, M. D. M., Eldorado National Forest, California, estimated to be approximately 10,600_ M feet, b. m., more or less, of ponderosa pine,_ sugar pine, Douglas fir and incense cedar, 70 percent pine. No bid will be considered of less than $2.00 per M feet b. m., for ponderosa pine, $2.75 per M feet b. m., for sugar pine, $0.50 per M feet b. m. for Douglas fir and $0.50 per M feet b. m. for incense cedar. In addition, the purchaser will be required to make deposits for reforestation and other silvicultural work on this sale area at the rate of $3.00 per M feet b. m. merchantable scale of ponderosa pine, $3.25 per M feet b. m., merchantable scale of sugar *67 pine, $2.50 per M feet b. m. merchantable scale of Douglas fir and incense cedar. $2,500.00 must accompany each bid to be applied on the purchase price, refunded or retained in part as liquidated damages according to conditions of the sale. The right to reject any and all bids reserved. Before bids are submitted full information concerning the timber, the conditions of sale, and submission of bids should be obtained from the Forest Supervisor, Placerville, California.
The difference between “bids” and “deposits” specified in the invitation was a matter of Forest Service administration. Potential bidders were required by the invitation to figure on minimum stumpage rates of $5 for ponderosa pine, $6 for sugar pine, and $3 each for Douglas fir and incense cedar.
These minimum stumpage rates were lower than the going stumpage rates for timber not damaged by fire, but not so much lower as to put a reasonably informed and competent operator on notice that the sale would be confined to dead and dying timber.
No bid was received by the Forest Service on or prior to October 17,1947.
7. Prior to October 17, 1947, the Forester had talked with representatives of two box companies in Sacramento concerning the salvage of the timber. One of these firms (hereinafter referred to as the box company) had made a tentative proposal to a Sacramento lumber company in respect to the timber. After October 17, 1947, the Forester and one of his assistants talked with several local lumbermen and logging operators, endeavoring to find means of interesting small operators in parcels of the timber. Sometime prior to December 18, 1947, the box company approached Theodore Eupley (one of the plaintiffs who is hereinafter sometimes referred to as Eupley) concerning the purchase by the box company of timber to be logged by plaintiffs.
8. In November and December 1947, Eupley was engaged in logging operations near the Allen ranch burn. In the course of those operations and during his negotiations with the box company Eupley learned, if he had not known before, of the fact that there was fire-damaged timber for sale in the national forest part of the Allen ranch burn.
9. On December 17 or 18, 1947, the Forester was visited at his office in Placerville by Eupley who inquired whether *68 or not the Forest Service had any timber for sale. During his interview with the Forester, Rupley was told of the timber in the Allen ranch burn, and expressed interest in it. At that time, or within a few days thereafter, Rupley read the invitation for bids set forth in finding 6, and obtained a map of the burned area and a standard form of timber sale agreement. Immediately after his interview with the Forester, Rupley examined the Allen ranch burn.
10. On December 19,1947, Rupley and the Forester met in the box company’s office with a representative of the company. The prices stated in the Forest Service’s invitation for bids were discussed. Rupley asked the Forester if any of the overmatured trees in the virgin stands would be marked for cutting, and the Forester told Rupley that such trees would be marked where needed to complete the logging of the area in order to obviate the necessity of further logging of high-risk trees in the burned area at a later date.[1] The representative of the box company expressed a desire to examine the timber before concluding an agreement with plaintiffs.
11. On December 29, 1947, at the Forester’s office, Rupley and the Forester discussed contract terms, particularly the definition of merchantability, and agreement was reached between them on the wording of the clause relating thereto.
12. In the course of conversations and negotiations between Rupley and the Forester other matters were discussed.
At one point Rupley asked the Forester about the volume of the marking and cutting that had been done in those portions of the Allen ranch burn that had been cut over, and the Forester told Rupley that 65 to 70 percent of the standing green timber had been marked for cutting.[2]
*69 Rupley also asked and was told of the method by which the Forester had made his estimate of the volume of timber to be removed from the Allen ranch burn, and stated that he considered the estimate reasonable.
13. On December 31, 1947, plaintiffs executed and submitted to the Forest Supervisor, on a standard Forest Service form, a bid which recited (1) that the bid was submitted in response to the notice of sale published in the Mountain Democrat; (2) that plaintiffs would pay “deposits plus price bid” for sawlogs estimated at 5,300 M board feet of ponderosa pine ($5 per M), 2,300 M board feet of sugar pine ($6 per M), 2,300 M board feet of Douglas fir ($3 per M), and 700 M board feet of incense cedar ($3 per M); (3) that, if declared the successful bidder, plaintiffs agreed to execute a contract of sale and furnish a satisfactory bond in the sum of $4,000; and that a check for $2,500 was transmitted therewith. On the face of the form was a typewritten notation “Bids opened 8:00 A. M., October 20,1947.”
When the timber sale agreement between plaintiffs and the Forest Service was later approved, the Forest Supervisor certified that the agreement was made after advertising in newspapers and to the highest bidder as to price.
14. (a) At the time plaintiffs’bid was submitted, and when the timber sale agreement was executed by them and approved by the Forest Supervisor, plaintiffs’ understanding[3] of the situation was that the timber to be logged was in a fire salvage area and consisted of fire-damaged timber plus some high-risk trees; that the salvage timber in the cut-over areas was sparse and somewhat small; that in the cut-over areas live, green, undamaged trees would be left (unmarked and uncut) to reseed the area; that in the virgin stands the timber to be marked and cut included all fire-damaged trees and undamaged trees considered by the forest officers to be high risk; that such marking in the virgin stands would account for 65 to 70 percent of the timber in such stands. Plaintiffs’ understanding with respect to the marking of timber in the virgin stands influenced their decision to bid on the sale.
*70 (b) It is not established by the evidence (1) that plaintiffs were told by the Forester or understood him to say or to mean (i) that live, green trees undamaged by fire (other than high-risk trees) would be marked for cutting anywhere in the area, or (ii) that the marking of fire-damaged timber would be restricted to trees that were dead or dying (or so severely injured that their survival was improbable) as a result of the fire; or (2) that plaintiffs knew or ought to have known that fire salvage sales by the Forest Service generally were based upon such restricted marking.[4]
15. On January 26,1948, plaintiffs executed, and on January 30, 1948, the Forest Supervisor approved a timber sale agreement between plaintiffs and the Forest Service. The agreement was contained within a standard Forest Service Timber Sale Agreement form, with additions and deletions agreed upon by the parties. Pertinent parts of the agreement follow:
Description of Timber. — 1. We, Burley Brothers, a copartnership, organized and existing under the laws of the State of California having an office and principal place of business at Placerville, State of California, hereinafter called the purchaser, hereby agree to purchase from an area of about 1,800 acres to be definitely designated on the ground by a Forest officer prior to cutting, in Sections 3, 4, 8, 10,16,17, and 20, Township 12 North, Bange 11 East and Section 34, Township 13
*71 North, Range 11 East, M. D. M., all within the Allen Ranch Burn, within the Eldorado National Forest, as definitely designated on the attached map which is a part of this agreement, at the rate or rates and in strict conformity with all and singular the requirements and conditions hereinafter set forth, all the dead timber standing or down and all the live timber marked or designated for cutting by a Forest officer, merchantable as hereinafter defined for Sawlogs.
Timber upon valid claims and all timber to which there exists valid claim under contract with the Forest Service is exempted from this sale. The estimated amount to be cut under the methods of marking described in Section 4 is live and dead
Ponderosa Pine ------ 5,300 M. feet b. m.
Sugar Pine----- ------ 2,300 M. feet b. m.
Douglas Fir_____ ______ 2,300 M. feet b. m.
Incense Cedar__ ______ 700 M. feet b. m.
a total of 10,600, more or less.
Payments. — 2. The purchaser hereby agrees to pay to the Treasurer of the United States (all remittances to be mailed to the Regional Fiscal Agent, Forest Service, 630 Sansome Street, San Francisco 11, California), or such other depository or officer as shall hereafter be designated, to be placed to the credit of the United States, for the timber at the following rates of stumpage:
Ponderosa Pine-------------------------$2.00 per M. feet b.m.
Sugar Pine-----------------------------2.75 per M. feet b.m.
Douglas Fir---------------------------- .50 per M. feet b.m.
Incense Cedar-------------------------- .50 per M. feet b.m.
2a. In addition to making payments for stumpage, as herein provided, the purchaser further promises and agrees to deposit in the above-designated depository, when called for by the Forest Officer in charge, such sum or sums as will amount to $3.00 for Ponderosa pine per thousand feet board measure and $3.25 for Sugar pine per M. feet board measure and $2.50 per M. feet board measure for Douglas Fir and Incense cedar sawtimber, respectively, merchantable under this agreement, to be covered into the Treasury of the United States, as a special fund for paying the cost of (1) planting (including the production or purchase of young trees), (2) sowing with tree seeds (including the collection or purchase of such seeds), or (3) cutting, destroying, or otherwise removing undesirable trees or other growth, on the National Forest land cut over by the purchaser, in order to improve the future stand of timber. Such deposits are not subject to refund except as they may be in excess *72 of the amount actually found due under the provisions of this section. (Act of June 9, 1930; 46 Stat. 527.)
•i* »í* *!» *J»
2c. Material unmerchantable on account of defects as hereinafter defined may be removed without charge in the discretion of the Regional Forester. Material unmerchantable because of size as hereinafter defined, removed at the option of the purchaser, shall be paid for at the same rates as merchantable material.
Period of contract — 3. Unless extension of time is granted, all timber shall be cut and removed and the requirements of this Agreement satisfied on or before December 31, 1948.
Marking — 4. Live timber shall be marked or designated for cutting as follows: Only trees of merchantable size as determined by Sections 5 and 5a herein shall be marked for utilization.
Merchantability — 5. Any tree twenty-two inches (22") and over at a point four and one-half feet (4%') above the ground which in the judgment of the Forest Officer contains one or more logs having a total net scale of twenty-five per cent (25%) or more of the total volume of the tree and any tree under twenty-two inches (22") in diameter at a point four and one-half feet (4%') above the ground which in the judgment of the Forest Officer contains two sixteen foot (16') sawlogs merchantable as hereinafter defined may be marked or designated for cutting as a merchantable tree.
5a. All Ponderosa and Sugar pine sawlogs are merchantable which are not less than twelve feet (12') long, at least ten inches (10") in diameter inside bark at the small end, and after deductions for visible indications of defect scale thirty-three and one-third per cent (33%%) of their gross scale: Provided, That logs of other species are merchantable which are not less than twelve feet (12') long, at least ten inches (10") in diameter inside bark at the small end, and after deductions for defect scale fifty per cent (50%) of their gross scale; and Provided further, That firm blue stain shall not be regarded as a defect.
11. The purchaser shall cut all and only marked or designated live trees and shall remove all merchantable material from the sale area. No timber shall be cut until paid for, nor removed from the place or places agreed upon for scaling until scaled, measured, or counted by a Forest officer.
*73 31. Complaints by the purchaser as to any action taken by a Forest Officer respecting this agreement shall not be considered unless made in writing within thirty (30) days of such action to the Forest Supervisor having jurisdiction. The decision of the Secretary of Agriculture shall be final in the interpretation of the regulations and provisions governing the sale, cutting, and removal of the timber covered by this agreement.
32. All operations on the sale area, including the removal of scaled timber, may be suspended by the Forest Officer in charge, in writing, if the conditions and requirements contained in this agreement are disregarded, and failure to comply with any one of said conditions and requirements, if persisted in, shall be sufficient cause for the termination of this agreement: Provided, That the Chief, Forest Service, may, upon reconsideration of the conditions existing at the date of sale and in accordance with which the terms of this agreement were fixed, and with the consent of the purchaser, terminate this agreement, but in the event of such termination the purchaser shall be liable for any damages sustained by the United States arising from the purchaser’s operations hereunder.
‡ ‡ $
34. The term “Forest Officer in charge,” wherever used in this agreement, signifies the officer of the Forest Service who shall be designated by the proper supervisor to supervise the timber operations in this sale.
‡ $ $ $ $
A map entitled “Allen Ranch Salvage Area” was attached to the copy of the contract forwarded to plaintiffs by the Forest Service after execution and approval.
The contract and map are in evidence as plaintiffs’ Exhibits 3-a and 3-b, and are incorporated herein by reference.
16. On February 13, 1948, plaintiffs entered into an agreement with a lumber company to sell to it the “estimated volume of sawlogs * * * to be cut from the Allen Ranch Salvage Area” to the extent of 10,600 M board feet for the price of $23.50 per thousand feet.
17. Shortly before or after the foregoing agreement was made, it was discovered that some of the acreage shown on the map of the sale area was not national forest land. The reduction in the area was later estimated to cause a reduction in the volume of timber to be removed of 500,000 board feet. Plaintiffs and defendant considered the matter and *74 agreed to continue their agreement, with the reduced area and volume. The over-all volume of timber estimated for removal thereby became 10,100,000 board feet. Plaintiffs make no claim concerning this reduction of 500,000 board feet, and both parties, at the trial of this action, accepted a proportionate reduction in species, whereby the quantities estimated for removal became 5,050 M feet of ponderosa pine, 2,191.5 M feet of sugar pine, 2,191.5 M feet of Douglas fir, and 667 M feet of incense cedar.
18. Logging operations were begun on March 16, 1948. Plaintiffs began work near the west central part of the area, in a portion thereof that had been previously cut over, and where severe fire damage was evident,[5] and worked southward. The timber that had been marked for cutting included all trees which, in the judgment of the foresters, had been killed by the fire, were so damaged that they would not survive, or were such poor risks from the standpoint of age, infection, or decay as to warrant removal. Defendant limited its marking throughout the sale area to these standards. As plaintiff worked through the areas previously cut over, the forest was appreciably thinned. There remained, however, substantial quantities of live, green, relatively undamaged timber, unmarked and uncut. Plaintiffs raised no question about the failure of defendant to mark these trees.[6]
19. By the end of August 1948, plaintiffs were nearing the completion of the felling of trees in all areas that had been marked, which included most of the areas previously cut over and some small areas of virgin stands. These segments represented somewhat more than half of the sale area. In all such segments there was evidence of serious fire damage. Plaintiffs were ready to move into other stands of virgin timber, but defendant had marked no trees in them. In these virgin stands[7] evidence of widespread fire damage remained, although the trees generally were green and the fire damage did not appear to be as serious as had been apparent in the areas theretofore marked and cut.
*75 On September 1, 1948, plaintiffs asked the forest officer to mark trees in the unmarked virgin stands, and the forest officer replied that he had no authority to mark green timber.
20. In forestry work and in logging operations, as related to ordinary stands of timber not damaged by fire, the terms “green timber” and “live timber” are synonymous. In the application of its standard form of timber sale agreement to sales of timber undamaged by fire, the term “live timber” as used therein is deemed by the Forest Service to be identical with the expression “green timber” as used by lumbermen and logging operators. In the application of the standard form of timber sale agreement to sales of timber in fire-damaged areas, a distinction becomes possible, in that timber may be “live” although so damaged by fire that it will not long survive, whereas the term “green timber” may designate timber undamaged by fire or, if damaged, slightly so, and relatively so undamaged as not to be subject to removal for salvage. It is not established by the evidence that this distinction had ever been applied by the Eldorado National Forest prior to the dispute which arose in this case, although the Forester and some of his assistants were aware of it or became so aware after the dispute arose.
21. After the forest officer’s refusal to mark timber in the unmarked virgin stands, plaintiffs applied to the Forester and were told by him that no green timber in those parts of the sale area would be marked.
22. No trees in the unmarked virgin stands of the sale area were marked by defendant. The growing season which had intervened within the year since the Forester’s estimate of 50-percent fire damage[8] in the unmarked virgin stands had proved that part of the estimate entirely wrong. In September 1948, the Forester and his assistants were of the opinion, based on the recovery of the timber in the unmarked virgin stands as indicated by the growing season, that none of it had been so damaged by the fire of September 1947 as to warrant removal as dead or unlikely to survive. On the basis of this determination, the Forest Service did not mark the high-risk trees in these areas.
*76 23. Plaintiffs completed the logging of all marked timber on November 14,1948. The volume of timber removed follows:
Ponderosa pine_____________________________ 3,936,110 feet
Sugar pine_________________________________ 1,359,600 feet
Douglas fir________________________________ 918, 810 feet
Incense cedar______________________________ 387, 690 feet
Total____________________________________ 6,602,210 feet
The difference between the amount of timber removed and the estimate (as revised) of 10,100,000 feet for removal is 3,497,790 feet or, in round numbers, 3,500,000 feet.
24. During 93 working days in July, August, September, and October, plaintiffs’ average production was approximately 50,000 feet per day. In preparation for entering the undamaged virgin stands, plaintiffs were planning, and before the end of August had taken some steps to execute their plans, to increase their output. Plaintiffs could have produced between September 1 and December 31, 1948, 3,500,000 feet more than were actually produced after September 1,[9] if they had been permitted to do so, and if timber to that extent had been available.
25. (a) The unmarked virgin stands within the sale area contained trees, to the extent of 3,500,000 feet, which (1) had suffered some damage by fire or (2) were high-risk trees.
(b) The growing season which intervened between the estimate made in September 1947 and the time of marking, in the summer of 1948, brought about a substantial decrease in the amount of timber seriously damaged by fire.
(c) It is fair to conclude from the evidence as a whole that the total of high-risk trees and trees showing material damage by fire in the summer of 1948, in the whole of the sale area, was 8,352,210 feet.[10]
(d) On the basis of the Forester’s estimate of volume by species, the 8,352,210 feet of timber included 4,176,105 feet of ponderosa pine, 1,811,037.75 feet of sugar pine, 1,811,037.75 feet of fir, and 554,029.5 feet of cedar. Deductions of plain *77 tiffs’ cuttings from these revised estimates of volume by-species show the following results:
Species Ponderosa... Sugar pine___ Pir__________ Cedar_______ Totals. Estimate Cut Balance 4,176,105 1.811.037.75 1.811.037.75 554,029.50 3,936,110 1,359,600 918,810 387,690 239,995 451.437.75 892.227.75 166,339.50 8,352,210.00 6,602,210 1,750,000.00
26. (a) Under the timber sale agreement the average stumpage cost to plaintiffs for the volume of timber shown in the “balance” column of finding 25 (d) would have been $4.47 per M.[11] Applied to 1,750,000 feet, the total stumpage cost would have been $7,822.50.
(b) Logging of the volume of timber shown in the “balance” column of finding 25 (d) would have cost plaintiffs an average of $15.95 per M. Applied to 1,750,000 feet, the total logging cost would have been $27,912.50.
(c) Stumpage and logging costs combined would have averaged $20.42 per M. Applied to 1,750,000 feet, the total cost of stumpage and logging would have been $35,735.00.
(d) Plaintiffs had a contract for the sale of the additional timber at the price of $23.50 per M, or a total, for 1,750,000 feet, of $41,125.00.
(e) Plaintiffs’ inability to obtain additional timber caused a loss of profit of $3.08 per M, or a total, for 1,750,000 feet, of $5,390.00.
27. The following exchange of correspondence occurred.
(a) Letter dated September 21, 1948, from plaintiffs to the Forest Supervisor:
* * * Pursuant to * * * agreement and in accordance with * * * section 31, the undersigned purchaser * * * hereby complains of the action taken by the Forest Officer * * * in refusing to mark or designate for cutting merchantable live timber *78 upon the sale area to the extent of the estimated amount to be cut.
Said agreement provides that the purchaser shall cut all and only marked or designated live trees and shall remove all merchantable material from the sale area (section 11). In order that the purchaser can comply with its contractual obligations under said agreement and those made pursuant thereto, it is necessary that the Forest Officer in charge mark or designate such timber sufficiently in advance to permit the purchaser to plan and accomplish proper and economical falling and logging operations.
The amount of live timber marked or designated to date falls short of the estimate from 3^-4 million feet, and the limited remaining time available for operations under said agreement is such that immediate action in this matter is imperative. Should the purchaser fail to meet its contractual obligations, said purchaser is likely to sustain heavy losses. * * *
(b) Letter dated October 25,1948, from the Forest Supervisor to plaintiffs :
* * * We sent your letter, with attachments, to our San Francisco Office for an opinion from the Regional Attorney as to whether or not we would be bound under the terms of the agreement to mark green timber on the sale area to make up the difference between the amount of fire killed timber marked and the estimate of 10,600 M contained in the agreement.
He has substantiated our opinion that we cannot mark green timber. All interested parties were aware that this sale was made for the express purpose of salvaging the timber killed by the Allen Ranch Fire. Unfortunately, that fact was not clearly provided for in the agreement. However, we cannot alter the understood intent of the agreement by marking live trees to provide a volume based upon rough estimates of fire killed material which were influenced by the belief that the extent of the damaging fire was greater than proved to be the case.
You are entitled to an appeal of this decision if you so desire to the Regional Forester. The procedure in this would be for you to file with me a written request for reconsideration thereof, or notice of appeal. It will be transferred to the Regional Forester immediately for his action. He will then correspond with you directly.
*79 28. Plaintiffs duly appealed the ruling of the Forest Supervisor. The appeal was forwarded to the Chief of the Forest Service in Washington, who wrote plaintiffs on December 1,1948, as follows:
* * * Your appeal has been given careful study. No final decision has been reached, but instead the case is being returned to the Regional Forester for his further consideration of the decision expressed to you at your meeting with Mr. Berry on October 26, and by Supervisor Smith’s letter of October 25. * * *
29. On December 18,1948, the Forest Supervisor submitted to plaintiffs a proposed modification of the timber sale agreement whereby plaintiffs would be permitted to cut another 700,000 feet from the sale area by May 31, 1949. On December 14, 1948, plaintiffs notified the Forest Supervisor of their refusal to enter into the proposed modification of agreement.
30. The timber sale agreement expired on December 31, 1948. On January 12, 1949, the Regional Forester advised plaintiffs and its bonding company that the agreement had been faithfully performed by plaintiffs.
31. On March 4, 1949, the Chief, Forest Service, transmitted to plaintiffs a copy of his decision on their appeal, as contained in a memorandum from him to the Regional Forester. Part of the decision follows:
* * * The complete record and background of the case as furnished by you contains a number of factors which I have considered in reaching decision on the appeal. Some of the more important factors are:
1. It was clearly known by interested parties that the sale was for the purpose of salvaging fire-killed timber. This is clear from a review of the negotiations leading up to the sale wherein there was specific questioning and reply as to whether or not green timber would be marked for cutting. It is apparent therefrom that the intent was to provide for the cutting only of occasional green trees classified as “high risk” as cutting of the fire-killed timber progressed to obviate the need for early return to harvest a very small volume of timber to prevent further loss. * * *
2. The estimated volume in the sale was determined not from a systematic cruise after the fire but by use of maps of the area, and the results of earlier cruises *80 adjusted by estimate of the proportion of the timber fire-killed. Mr. Theodore Bupley, one of the partners who purchased the timber, made inquiry prior to the sale as to the method used in determining the estimate. Upon explanation of the method and after benefit of visits to the sale area Mr. Bupley expressed the opinion that the estimate was reasonable and subsequently agreed to purchase the timber. * * *
4. From the inception of operations on the sale until early in September when marking of the fire-killed timber was completed, the purchaser apparently was not concerned with the fact that on the area being cut-over, only fire-killed trees were marked. The file does disclose some disagreement in regard to marking but only in respect to the minimum size tree.
5. If the marking had not been terminated upon completion of marking the fire-killed timber and if the purchaser had continued to cut and remove timber until the expiration date of the sale, the total cut would only have been the amount actually cut or 6,602 M plus an amount estimated as 700 M additional or a total of 7,302 M feet. In spite of this, the purchaser is appealing for the right to continue cutting until a total of 10,600 M has been removed.
After full consideration of the case, including the purchaser’s appeal, the file record and your recommendations, it is my decision that your action in the case is satisfactory. The appeal from your decision in the case is therefore denied.
CONCLUSION OF LAW
Upon the foregoing special findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiffs are entitled to recover, and it is therefore adjudged and ordered that they recover of and from the United States five thousand three hundred ninety dollars ($5,390).

 High-risk trees in virgin stands could amount to fairly substantial volumes of timber. This fact was known to Rupley as well as to the Forester. On occasions, the marking of high-risk trees had run as high as 25 percent of merchantable timber in a virgin stand. This percentage was not communicated to Rupley by the Forester, and it is not established by the evidence that Rupley knew more than that the volume contributed by high-risk trees in virgin stands could and probably would be substantial.

 At the time of these negotiations, the standard marking practice of the Forest Service called for marking 50 to 55 percent of standing green timber. The higher percentage used in 1943 was standard practice at that time. The existing practice, and the difference between it and the 1943 markings, were not discussed by the Forester with Rupley.

 Cf. last sentence of the invitation for bids, finding 6.

 The conflict in the testimony of Rupley and the Forester is more apparent than real. The Forester did not tell Rupley that live, green trees wholly undamaged by fire and not considered poor risks would be marked for cutting. Rupley, under cross-examination, virtually admitted as much. Neither did the Forester consciously withhold from Rupley information which should have been given. The misunderstanding arose from the Forester’s assumption of knowledge and understanding on Rupley’s part which Rupley did not possess. The Forester did not explain to Rupley that the marking of fire-damaged timber would be restricted to trees that had been killed by the fire or were not expected to survive it. He did tell Rupley that he estimated the fire damage in the virgin stands at 50 percent; and at another time he told Rupley that markings in virgin timber on regular sales had run as high as 65 to 70 percent. He also said that high-risk trees would be marked. He gave Rupley a copy of the standard form of timber sale agreement providing that “live timber shall be marked or designated for cutting.” Rupley, without knowledge of Forest Service policy in fire salvage sales, and after having seen for himself the evidence of fire damage in the virgin stands, concluded that the marking in those stands would be equal to the previous (and, as far as he knew, the standard) marking practices in regular sales. Under all of the circumstances, this conclusion on his part was a reasonable one. It was shared by at least one other experienced lumberman who examined the situation and conferred with the Forester to find out for himself.

 By mutual agreement those trees were first marked and cut which were most susceptible to deterioration after fire damage.

 Cf. finding 14 (a).

 Hereinafter designated as unmarked virgin stands.

 Within the meaning of the term as used by the Forest Service.

 Given 80 flays of working time, a flaily average of less than 75,000 feet would have made the difference.

 Computed by adding 1,750,000 feet to the 6,602,210 feet cut by plaintiffs.

 “The cost of stumpage, based on “deposits plus prices bid,” would have been $4.30 per M. To this there must be added 17 cents per M, which the plaintiffs agreed, by separate contract, to pay for the services of forest officials in scaling the logs.