**EVERETT PLYWOOD CORPORATION, a Washington Corporation**

v.

**The UNITED STATES**

No. 199–75.

United States Court of Claims.

May 20, 1981.

---

7. *See* note 5 *supra.*

William F. Lenihan, Seattle, Wash., attorney of record, for plaintiff.

Sigurd Borgersen and Lenihan, Ivers, & McAteer, P.S., Seattle, Wash., of counsel.

Frances L. Nunn, Washington, D. C., with whom was Asst. Atty. Gen., Alice Daniel, Washington, D. C., for defendant.

Before DAVIS, NICHOLS, and KASHIWA, Judges.

## OPINION

NICHOLS, Judge:

The issues presented in this breach of contract case are (1) whether, under the doctrines of frustration or sovereign acts, the government may cancel a timber contract because of anticipated environmental damage without being liable for breach damages, (2) if the government is liable what the appropriate measure of damages is, and (3) whether the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (Supp. II 1978) (Act), authorizes the award of inter-

est. For the reasons discussed herein, we hold that the government is liable for damages resulting from a breach of the contract, and we set forth the appropriate damage formula later in the opinion. We also hold that the Act does not authorize an award of interest in this case.

Plaintiff, Everett Plywood Corporation (Everett), prosecutes various exceptions to the report of Trial Judge Harkins, wherein the trial judge recommended that cancellation by the government was not a breach because continued performance under the contract would have resulted in undue damage to the soil, watershed, and forest resources, thus frustrating the primary purpose of the contract. Everett also presents claims seeking recovery with interest for itself and its subcontractor. Lastly, Everett attacks the trial judge's report as motivated by prejudice.[1]

# I

*Facts*

Everett was a manufacturing cooperative located in Everett, Washington. It produced plywood from hardwood and softwood timber purchased in the Puget Sound area. Everett has since undergone liquidation for reasons not connected with this case. In 1970 Everett was the high successful bidder on a contract for the sale of standing timber located in the Mount Baker National Forest (hereinafter ARM sale or contract). Before setting the minimum acceptable bid on this contract, National Forest Service (NFS) staff prepared the sale between 1967 and 1969. A "cruise" or systematic sampling of the timber within the sale area was made to estimate the quantity and quality of the timber to be sold within the specified geographic area of four units. The contract also specified the bidder was to construct 3.2 miles of permanent timber access roads as designated by the NFS. The NFS would then pay for such designated roads by

$159,011 worth of purchaser road credits which would be applied by the purchaser against the agreed purchase price of the timber, or "stumpage."

After completing the cruise, the NFS followed the appraisal theory and principles established in the NFS Manual to determine minimum acceptable bid prices for the various types of timber contained in the sale. Such an appraisal is based on the proposition that the worth of the timber to the government—or "stumpage"—is the "selling value" of end products such as lumber and plywood manufactured from that timber minus both the costs of production (including specified road costs) and an allowance for profit and risk to the purchaser. The NFS estimates a "conversion return" which is the selling value minus cost of production, and this "conversion" is then divided between a projected profit to the purchaser and the indicated stumpage to the government. Indicated stumpage, therefore, is the projected residual which develops after all costs and purchaser profit have been deducted from estimated selling values. 36 C.F.R. § 223.4. To determine the minimum acceptable bid, the NFS then adds the cost of the roads specified in the contract to the indicated stumpage. The bidding process then determines the contract rate or actual stumpage. During the course of performance as the timber is logged, the purchaser pays the contract rate "stumpage" less the purchaser credits allowed for the specified road costs.

The ARM contract was advertised on December 21, 1969, for bids on an estimated total of 7,400 thousand board feet (MBF) comprised of 1,500 MBF Douglas-fir, 4,700 MBF western hemlock, and 1,200 MBF cedar. The NFS estimated the selling price per MBF for Douglas-fir at $167.45; for hemlock at $123.17; and for cedar at $110.79. Total production costs per MBF were estimated at $118.61 for Douglas-fir;

---

1. Although the court rejects the trial judge's recommended conclusion of law, we adopt, except for deletions, his findings of fact which we are not printing since such facts as are necessary to our decision are contained herein. We have deleted findings 3(a), 18, 21, 22, 23, 25, 26, 28, and 29. The trial judge is not precluded from adopting the same findings if the record supports them.

$94.78 for hemlock; and $97.39 for cedar. Specified road costs for each species were $21.49 per MBF. Indicated stumpage per MBF (selling value less costs) was $29.56 MBF for Douglas-fir; $14.21 for hemlock; and $.66 for cedar. The minimum bid price (indicated stumpage plus road costs) was $51.05 MBF for Douglas-fir; $35.70 for hemlock; and $22.15 for cedar. Everett bid $51.55 per MBF for the Douglas-fir and the minimum acceptable bid for the remaining species, and the NFS awarded the contract to Everett as high bidder. The contract was one of "adhesion" in that bidders had to accept the contract terms the government wrote into the invitation, only the price being open for the bidder to specify. Neither the contract nor the applicable agency regulations provided for cancellation of the contract for environmental reasons.

On April 27, 1970, Everett entered a subcontract with Miller Shingle Co., Inc. (Miller), whereby Miller was to perform all logging, road construction, road maintenance, and other timber removal services. For logging services, Everett agreed to pay Miller $40.00 per MBF for merchantable delivered timber. For Miller's road construction services, Everett agreed to pay Miller $190,500—an addition of $31,489 to the original $159,011 worth of purchaser road credits. Miller was obligated to accept any adjustments in the total contract price for subsequent changes in purchaser road credits by the NFS. Everett and Miller also agreed orally that Miller could purchase all cedar logged under the contract for $138.40 per MBF.

Miller began construction of the specified road into Unit 1 of the contract area in April 1970. Beginning in September 1970, clay deposits presented road construction problems, and the NFS halted logging in Unit 1 on February 18, 1970, because of road instability. The road was redesigned and repaired, and Everett received additional purchaser road credits for these additional road costs. Logging in Unit 1 resumed and road construction began in Unit 2.

By February 24, 1972, the NFS had concluded that road construction and logging planned for Units 3 and 4 would result in massive mantle failures with resulting soil and watershed damage, thereby making difficult the reestablishment of the timber stand. The NFS thereupon requested Everett to agree to a contract modification that would delete Units 3 and 4 from the contract and halt road construction in Unit 2. Everett refused, and a series of meetings were held in which Everett contested the NFS's evaluation of environmental factors, refused to agree to the cancellation, and insisted if there were a cancellation the NFS substitute other timber to replace any amounts that would be lost from the deletion of Units 3 and 4 from the contract. The NFS, however, decided that the contract could not legally be modified to include substitute timber outside of the sections so designated in the contract. In an internal communication, the deputy chief of the NFS also advised that unilateral cancellation by the government would expose the government to a claim for damages.

On October 19, 1972, the parties agreed to modify the sale contract. Units 3 and 4 were eliminated, additional road work was required to remove—"or put to bed"—the road already constructed in Unit 2, and all logging in Unit 2 was required to be done from a single point. Rates for timber removed after October 19, 1972, were redetermined and reduced. Purchaser road credits were adjusted downward, but road credits that had been earned and credited prior to October 19 were allowed as offsets of the new purchase price. Various provisions of the modification specified that Everett did not agree that environmental damage would result from performance under the original contract. Everett also reserved its rights and those of its subcontractor to seek damages for a breach of the original contract. A final provision stated that if the underlying agreement were not cancelled by the Secretary of Agriculture, the modification would be null and void.

Everett authorized Miller to complete the remaining work as specified in the modification. There was no further work under

the contract after the completion of logging in Unit 2 on November 21, 1972, and the putting of the Unit 2 road to bed on January 18, 1973. On August 20, 1973, Everett notified the NFS that the modification agreement permitted reinstitution of the original timber sale unless it was cancelled. Everett complained of the delay in the decision of the Secretary of Agriculture on cancelling the contract and stated the purpose of its letter was to precipitate a decision and give notice that interest would be claimed on any recovery. On October 17, 1973, the Secretary of Agriculture notified Everett that the original contract was cancelled, effective November 9, 1973.

Before the trial judge, Everett argued that the government was liable for common law breach of contract and that under the Uniform Commercial Code, § 2–713(1) (U.C. C.), the proper measure of damages was the difference between the contract price and the fair market value of the timber. Everett likewise argued that its subcontractor Miller was entitled to compensation for lost profits on road construction and for various costs incurred. Finally, Everett argued it was entitled to interest. The trial judge, however, proposed *sua sponte*, that under the doctrine of frustration of purpose the government had not breached the contract because the contractual obligation had become incapable of being performed without rendering performance radically different and worthless to the government. The government had not raised this frustration defense and the issues at trial centered on damages. The trial judge formulated an equitable solution so that neither party would suffer undue hardship as he thought. The trial judge awarded compensation to Everett for additional expenses incurred in putting the road to bed less expenses already recouped, and purchaser road credits earned. Likewise the trial judge both allowed and denied various claims brought on behalf of Miller. The trial judge also disallowed interest on the recovery because he considered the Contract Disputes Act inapplicable to timber sale contracts. For the following reasons we disagree with the trial judge and find that the government did

breach the contract and is liable for damages in accord with a formula we specify later in the opinion. We also hold that the Contract Disputes Act does not entitle Everett to interest, though for reasons different from those of the trial judge.

II

*Breach Issues*

■■■ The first impression one has is that the trial judge has seized on a contract doctrine evolved for quite unlike circumstances in order to further the high cause of environmentalism. It is a cause with numerous and devoted adherents, some of whom will not tolerate the balancing of environmental considerations against others perhaps equally high but of a different nature. Here the cause is deemed to override the normal obligations of a government contract, *i. e.*, if the Secretary of Agriculture is acting on behalf of the environment he can make any contract of his Department null and void. The effort of the government which has stepped into the market place and made contracts binding on others, to void them as applied to itself on behalf of some high public policy, is an old phenomenon in the law. The obligation of contracts clause is, of course, in the Constitution, but by its terms applies only to the states. *Lynch v. United States*, 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934) holds, however, that the just compensation clause of the fifth amendment prohibits the repudiation in whole or part of U. S. Government contracts. This holding resulted from an effort by Congress, noble in purpose, to save the solvency of the government in the great depression by cutting many government payments by 10 percent. *United States v. Bethlehem Steel Co.*, 315 U.S. 289, 62 S.Ct. 581, 86 L.Ed. 855 (1942) resulted from an erroneous belief that certain shipbuilding contracts made in World War I were not binding on the government because they allowed the builder an unconscionable profit. The Court held otherwise, though without prejudice to subsequent efforts of Congress to

control excessive profits of World War II which was then raging, by means the Constitution left open to it. *Perry v. United States*, 294 U.S. 330, 352, 55 S.Ct. 432, 435, 79 L.Ed. 912 (1935) involved the congressional repudiation of the clause in certain government bonds which called for payment in gold. This again was for high-minded policy reasons as the gold clause stood in the path of a necessary change in the basis of the currency. The Court held that the bonds, as contracts, bound the government which could not repudiate them without payment of compensation, though it calculated the compensation in a manner that deprived the bond holders of the profit they sought, that would have inured to them from the changed relative value of gold and U.S. money. There can therefore be no doubt that high reasons of public policy do not endow public officials with authority to repudiate contracts, though they may influence courts to refrain from interference by way of specific performance, etc., and from awarding damages that exceed a reasonable compensation for the lost contract rights. The plaintiff here wants its constitutional rights; it does not seek any windfall or punitive damages, and we do not intend to award any. This is the recognition the Secretary is entitled to for the weighty reasons and lofty purpose that animated him to cancel the contract in large part.

The instant contract provided for termination in some instances but did not contain any provision for termination in the event that occurred. *See* 36 C.F.R. § 221.17 (1965). Plaintiff says it is willing to accept the measure of compensation proposed by the government in timber contracts subsequently prepared for adhesion, that do allow termination for environmental reasons, with a formula for compensation to be used in such cases. *See* 36 C.F.R. § 222.9 (1980).

During World War II the use of standard termination articles became common in government contracts. They were devised and advocated by the War Production Board. Few government contracts now are without provisions for termination at least in some contingencies, and the instant con-

tract was not one of the few. A contract having such a clause would seem to represent to a bidder that the government has considered and stated the occasions which may lead it to terminate; and contrawise, it would seem to warrant by implication that it will not terminate for occasions not so stated. Thus the modern contracting practice is even more inimical to the legitimacy of unbargained for unilateral repudiation than was the situation when the cases cited above arose.

Here the Forest Service fully expected its unilateral termination would have the legal consequences of a breach. There were general warnings also in the Forest Service Manual. The trial judge rejected these indications as "but the reflection of legal caution typically shown on problems that arise during the course of administration of an ongoing program."

To escape its liability the government argues to us that the trial judge properly applied the defense of frustration. The government adds that liability cannot be imposed on the United States as its cancellation of the contract was a sovereign act.

■ The frustration doctrine has seen an increased application in private commercial contracts, and many courts have merged analysis under frustration with analysis under commercial impracticability. *See Transatlantic Financing Corp. v. United States*, 363 F.2d 312, 319 (D.C.Cir.1966). At least two approaches to frustration analysis have developed. Under one view frustration is applied to excuse performance where performance remains possible, but the value of the performance to at least one of the parties and the basic reason recognized by both parties for entering into the contract have been destroyed by a supervening and unforeseen event. *See* Williston, 18 *Contracts* § 1935 (3d ed. 1978). A second view is similar to the above, but recognizes the fact that a contract never has a purpose, only the contracting parties have a purpose; the purpose of any one of these persons can be different than the purpose of the other. Under this second view, when the purpose

of at least one of the parties is made worthless by a supervening event, performance is excused, depending not on the foreseeability of the supervening event, but on which party the risk of the event's occurrence should be allocated. The U.C.C. § 2–615 and accompanying comments provide a useful tool in applying this view of frustration. *See* Corbin, 6 *Contracts* § 1354 (1962).

Both of these views establish a rule that at minimum would excuse the government from performing in this case if (1) the recognition that continued performance of the contract would lead to environmental damage was a supervening event that should excuse performance, (2) the risk of the event was not borne by the government, and (3) the environmental damage would render the value of performance worthless to the government. *See Pauley Petroleum, Inc. v. United States*, 219 Ct.Cl. 24, —— n.13, 591 F.2d 1308, 1317, *cert. denied*, 444 U.S. 898, 100 S.Ct. 206, 62 L.Ed.2d 133 (1979). The trial judge, following the approach suggested by Corbin ("Corbin view"), found that the recognition that continued logging would result in unacceptable damage to the soil, to the watershed, and to the regeneration of the forest was an event that should excuse performance; that although this risk was foreseeable, it was not borne by the government; and lastly, that the NFS's purpose and motives in entering the contract were not commercial but instead were designed to accommodate public policy objectives in administering the national forests. Thus the trial judge considered the fact that environmental damage was foreseeable only to be probative and not dispositive. Everett contends that the *sua sponte* use of frustration was improper. Everett objects to the merger of frustration with impracticability analysis and argues that foreseeability should be dispositive.

■ We need not reach the issue of the propriety of the trial judge's use of frustration when neither party specifically urged it nor, so far as appears, expected it to be invoked as the decisive rule, because we hold it does not excuse the government's performance in this case. Although frustration and commercial impracticability are related, they deal with two different effects that unforeseen circumstances may have on performance. Under the frustration defense, the promissor's performance is excused because changed conditions have rendered the performance bargained from the promisee worthless, not because the promissor's performance has become different or impracticable. On the other hand, commercial impracticability excuses a promissor from performance because a supervening event changes the nature of the promissor's performance so that it has become commercially impracticable. Under frustration analysis the court is concerned with the impact of the event upon the failure of consideration, while under impracticability, the concern is more with the nature of the event and its effect upon performance.

At the outset, we have already distinguished between the power of the government to terminate the contract and the extent of its liability for the exercise of that power. Clearly, the government ought not to have stood idly by and continued with the contract if unacceptable damage to the environment were foreseen. On the other hand, whether the government can terminate the contract and escape making compensation is another issue, the issue we are concerned with. The government's argument in support of the trial judge fails to appreciate the distinction. The government bears a heavy burden in proving the defense of frustration. *See Pauley Petroleum, Inc. v. United States, supra.* The first requirement under the frustration test is a showing that the recognition that continued performance would lead to environmental damages was a supervening event. Although Everett now disputes whether environmental damage would have occurred, the trial judge viewed Everett's pleadings as conceding such. For our own analysis, we assume, arguendo, that environmental damage would have occurred. The government does not argue that there was any actual change in soil conditions after the contract was entered into, but instead, argues the event was the knowledge or realization that damage would occur. To char-

acterize this sudden government epiphany as a sufficient event is improper for two reasons. First, there was no discernible event, all the material facts on soil conditions were either known to the government or available. The government presented no evidence of any tests taken prior to the contract to determine soil conditions, or that such tests had become invalid because of new or previously unavailable knowledge. Second, the trial judge stated in his report that at the time the contract was awarded both parties were cognizant that environmental damage was possible. However, the trial judge adopted the Corbin view that the fact that the parties may recognize the possibility an abnormal contingency may become operative is probative in frustration analysis but not determinative against the party claiming the defense.

The case of *West Los Angeles Institute for Cancer Research v. Mayer*, 366 F.2d 220 (9th Cir.), *cert. denied*, 385 U.S. 1010, 87 S.Ct. 718, 17 L.Ed.2d 548 (1966), is representative of the Corbin view that the foreseeability of the event is not determinative. Plaintiff there contracted to sell property to the defendant and utilized a scheme that would have resulted in favorable tax treatment. Both parties decided it was unnecessary to include a provision that either party could rescind in the event these tax advantages proved to be unavailable. The Internal Revenue Commissioner ruled against the scheme and the plaintiff brought a recission action. The court held that "it would be untenable to conclude that the parties intended that the * * * [plaintiffs] should assume the risk of an adverse tax ruling simply because such a ruling was, in a sense, 'foreseeable' and because the contract did not expressly excuse performance in the even of its occurrence." *Id.* at 226.

Regardless of the merits of this Corbin approach in private commercial contracts, there may be good reason not to follow it in deciding whether to excuse the government's performance in cases like the one before us. It is a legitimate exercise of judicial power to excuse performance in situations unprovided for because they were not reasonably within the contemplation and intentions of the parties. Where an event is reasonably foreseeable and a provision is not written into the contract to cover that event, one questions whether that event should be considered supervening, at least where the government is claiming the excuse under a standard contract in which all the provisions are predetermined and accepted on a "take it or leave it" basis by the highest bidder. The government could have promulgated regulations if necessary or inserted a provision to terminate the contract in an event of this type, thereby escaping breach liability. For this court to rewrite the contract and, in effect, insert such a provision might be unfair to the plaintiff, since the appearance of such a provision initially might have influenced plaintiff's deciding whether to adhere to the contract terms proposed, take it or leave it, or bid a lesser amount. Defendant could have proposed a termination article to cover the case; plaintiff could not have. Therefore, in cases where the government is seeking an excuse from performance under a contract which the other party is required to accept on a "take it or leave it" basis, we have some doubts about the Corbin view that foreseeability is only probative.

Even if the government's knowledge that environmental damage could occur was not dispositive and only probative, given the facts of this case and the decisions of this court in the area of impracticability of performance, the risk of the occurrence of the event is on the government. In the analogous area of impracticability of performance, this court has not lightly excused performance and has set forth several rules of analysis. First, the court must look at the contract as a whole to see if, fairly read, the party claiming an excuse is charged with the risk of the event's occurrence. Second, the risk of the event should generally be placed on the party with the greater knowledge. And if specifications are involved, generally the party that designed the specifications must lose if they are commercially or absolutely impossible. *Foster Wheeler Corp. v. United States*, 206 Ct.Cl. 533, 513 F.2d 588 (1975). It was defendant, not

plaintiff, who as owner of the tracts to be harvested would be presumed to be the party informed as to soil conditions and geologic structure that might indicate that logging would endanger the environment.

In the instant case, the ARM contract contained provisions covering rate redetermination for devalued timber, cost adjustment for physical change, liability for loss of timber, termination by purchaser for catastrophe, and termination for changed conditions. All of these provisions discuss various supervening events and the effect such events should have upon the contract. In cases of less than catastrophic physical change or damage to timber or the surrounding area, the purchaser is granted cost adjustments. In the event of a catastrophic event making performance impracticable, the purchaser is granted the option of terminating the contract. Additionally, the contract permitted a waiver by mutual agreement of those contract requirements that would no longer serve their purpose because of changed conditions. In view of these express provisions specifically granting relief to a purchaser from loss and catastrophe and the absence of any provision allowing the government similar relief from environmental damage, the contract as fairly read allocates to defendant the risk of being in breach if it must cancel because of the risk of environmental damage.

The trial judge cited *Rupley v. United States*, 124 Ct.Cl. 59, 64 (1952) as support for the proposition that the risk of a supervening event is allocated to the purchaser in a timber contract. The trial judge, however, reads *Rupley* too broadly. In *Rupley*, plaintiffs contracted with the NFS to log fire damaged timber and high-risk trees. The agreement set forth an estimated amount. Because plaintiffs were permitted to cut less than the estimated amount, they sued for damages. This court held plaintiffs were not entitled to recover for previously damaged trees that recuperated. The case held that the wording of the contract indicated that only fire damaged and risk trees were covered and that the estimated amount was not a warranty. Plaintiffs did

bear the risk of tree recuperation under the terms and provisions of the contract. That case did not discuss frustration or impossibility and definitely did not set a general rule on allocation of risk.

The government designed the logging roads in question. It thus was or should have been in the best position to evaluate the effects of road construction on soil conditions. Under the *Spearin* doctrine, the government is usually held to warrant the correctness of design specifications. *United States v. Spearin*, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918). For this case, however, we need not decide whether a specified road is a design specification within the meaning of defective specification caselaw. We do find the fact that the government did design the specified roads is relevant for purposes of allocating the risk of environmental damages caused by the construction of those roads.

Because we find that the contract allocated the risk to the government, we hold the government did not meet its burden of proving the frustration defense. We therefore need not address the issue of whether the value of performance to the government became worthless.

The government argues that even if we find performance was not excused under frustration, the government is still not liable for breach of contract under the doctrine of sovereign acts. *See Amino Brothers Co. v. United States*, 178 Ct.Cl. 515, 372 F.2d 485, *cert. denied*, 389 U.S. 846, 88 S.Ct. 98, 19 L.Ed.2d 112 (1967). Over 100 years ago this court defined the doctrine of sovereign acts: "[w]hatever acts the Government may do, be they legislative or executive, so long as they be public and general, [those acts] cannot be deemed specially to alter, modify, obstruct or violate the particular contracts into which [the government] enters with private persons." *Jones v. United States*, 1 Ct.Cl. 383, 384 (1865). From the facts of this case it is obvious that the act in question was neither public nor general— the government unilaterally terminated one contract after deciding continued perform-

ance would have been unwise. It would have been an entirely different case if Congress had passed a law immediately prohibiting all cutting in all public forests, but this unilateral termination does not constitute a sovereign act that excuses the government from breach damages. Thus the government is not excused from breach damages either under the sovereign acts doctrine or frustration.

### III

*Damages*

■ The trial judge, in accordance with this theory of the case, denied plaintiff any recovery for timber on Units 3 and 4, but he allowed $20,754 for "the cost of putting the road to bed" and $7,754 in recognition of purchaser road credits earned. Defendant does not contest these items and therefore we affirm them.

The Forest Service by 36 C.F.R. § 223.-9(a)(5) (1980) would now allow a contractor in case of a cancellation for environmental reasons—

Unrecovered costs incurred under the contract and the difference between the current contract value and the average value of comparable National Forest timber sold during the preceding 6-month period.

Some of the "unrecovered costs" are we suppose the costs the trial judge allowed. The comparison to be made we suppose is between the two "selling values" as that term is explained in part I above and in 36 C.F.R. § 223.4(a) (1980).

Because of the complicated way the Forest Service goes about determining stumpage rates, the assessment of breach damages would be and is complex and controversial. *Cf. Everett Plywood Corp. v. United States*, 206 Ct.Cl. 244, 512 F.2d 1082 (1975). The defendant excepts to the calculations set forth by the trial judge in findings 21–23 in which he computes damages of $149,427.66 on the basis of comparing the contract price of the cancelled timber in Units 3 and 4 with its fair market value. This of course was a futile exercise in his

view of the case, but our trial judges do this kind of thing in the event the court should disagree, as here we do, with their legal conclusions. It is to be noted the new termination settlement formula is not the same as the trial judge's and apparently it calls for data based on actual sales, not opinions. On the other hand, it does not require actual purchases against the contract as defendant would require as proof of damage.

Defendant's new formula we presume reflects the opinion of its experts as to how a fair settlement should be computed in case of a cancellation for environmental reasons. Plaintiff is willing to accept it in lieu of the trial judge's findings. It appears to us to reflect a reasonable measure of damages. In our view, the settlement ought not to differ very widely from the just compensation that would be due for a taking of the contract as it related to Units 3 and 4. We would hope the computations to apply the formula would not require a lengthy further trial. Accordingly, we determine that in further proceedings under Rule 131(c) damages shall be computed in accordance with the above-quoted new Forest Service formula. The record before us is not sufficiently developed to calculate damages. A remand to the trial division is therefore appropriate to determine damages on the basis of the present NFS method embodied in 36 C.F.R. § 223.9(a)(5).

■ Everett also seeks recovery on various items for its subcontractor. Save for one issue, we decide to defer a decision on the claims presented for the benefit of Miller, since some of those items might be compensable under the present NFS damage provision. Everett claims it is entitled to recover for Miller the difference between the price of the red cedar as established in the oral contract between Miller and Everett and the amount Miller was required to pay as a result of the government's breach. The decided cases clearly establish that a contractor may bring suit against the United States on behalf of its subcontractor only when the prime contractor has reimbursed its subcontractor for the latter's damages or

upon proof that the prime contractor is liable to the subcontractor for damages. *G. L. Christian and Associates v. United States*, 160 Ct.Cl. 1, 312 F.2d 418, *cert. denied*, 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963); *J. L. Simmons Co. v. United States*, 158 Ct.Cl. 393, 397–98, 304 F.2d 886, 888–89 (1962).

We agree with the trial judge that Everett may not bring this claim. Everett has not shown that its oral agreement with Miller was an integral part of the subcontract instead of being a collateral agreement. Also, Everett has not demonstrated that it would be liable to Miller for Miller's costs in procuring the cedar.

## IV

*Interest*

■ Everett also requests interest on its award, computed from May 22, 1972, relying on the Contract Disputes Act. The trial judge, however, did not reach analysis under § 611 because he found that a timber contract was not covered by the Act. Under 41 U.S.C. § 602(a):

Unless otherwise specifically provided herein, this Act applies to any express or implied contract (including those of the nonappropriated fund activities described in sections 1346 and 1491 of Title 28, United States Code) entered into by an executive agency for—

(1) the procurement of property, other than real property in being;

(2) the procurement of services;

(3) the procurement of construction, alteration, repair or maintenance of real property; or,

(4) the disposal of personal property.

The trial judge concluded that under the U.C.C. a contract for the sale of timber to be severed by the buyer was not a sale of goods but a contract affecting land, and that therefore it did not fit the requirements of the above section. The trial judge, however, followed the definition of goods in U.C.C. § 2–107 as originally promulgated. An official amendment, adopted by the Code Commission in 1972 and by at least 21 states, now defines timber to be severed under a contract as a sale of goods irrespective of the party doing the severing. Thus a timber contract is the sale of personal property for purposes of federal law and is not an interest in land. Therefore, we hold that the Act does apply to this case.

Under Section 16 of the Act, Pub.L.No. 95–563, 92 Stat. 2383 (November 1, 1978) (not codified in U.S.C.):

This Act shall apply to contracts entered into one hundred twenty days after the date of enactment. Notwithstanding any provision in a contract made before the effective date of this Act, the contractor may elect to proceed under this Act with respect to any claim pending then before the contracting officer or initiated thereafter.

Everett contends that a May 19, 1972, letter, wherein Everett stated its demand for action and a claim for interest, amounted to a claim before a contracting officer. Everett then argues that because the contracting officer had no authority to decide Everett's claim for damages and interest, the contracting officer never rendered a final decision, and, therefore, the claim was pending before the contracting officer on the required date.

The lack of merit to Everett's contention is obvious. All we need say is that § 16 refers to those claims properly then pending before a contracting officer. In this case, Everett's claim was filed in this court in 1975. Thus, at the time of the enactment of the Contract Disputes Act in 1978, Everett's claim was before this court, and not before a contracting officer with authority to hear the claim.

Everett's argument is actually a request to rewrite the Act to cover all breach claims pending at the time of the Act's passage. Although Everett claims timber contracts are special because the NFS cannot entertain breach claims, Everett is incorrect. When the Act does not apply, the authority of any contracting officer is limited to disputes covered by the disputes clause of the contract. A breach claim, however, is beyond the standard disputes clause. *See*

734

United States v. Utah Construction & Mining Co., 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966). Since Congress clearly specified that the Act should only apply retroactively to claims pending before a contracting officer and not to breach claims that had been initiated prior to the Act's passage and were pending before a court, we dismiss Everett's argument.

V

*Prejudice claim.*

■ Lastly, Everett claims the trial judge's decision was motivated by personal passion or prejudice. However, errors of law or even of fact finding without more are insufficient to show prejudice. The best of us are sometimes mistaken. Everett has not presented any evidence to show bias or prejudice except that it did not prevail with the trial judge; in fact, there is so little support that it appears Everett's intent may have been to raise these charges so as to obtain a different trial judge upon remand. Such claims of bias and prejudice without hard evidence serve no purpose. Where there are errors, this court will correct them, and groundless bias charges provide no assistance.

CONCLUSION OF LAW

Therefore, this court holds that the government's unilateral termination of its contract with Everett was a breach entitling Everett to recover compensable costs and breach damages by the formula set out in 36 C.F.R. § 223.9(a)(5). Judgment is entered for the plaintiff on entitlement. This case is remanded to the trial division pursuant to Rule 131(c)(2) to calculate damages without interest pursuant to the conclusions stated herein.