## PECK IRON AND METAL CO., INC.

### v.

### The UNITED STATES.

### No. 408–77.

United States Court of Claims.

April 7, 1982.

Urban A. Lester, Washington, D. C., attorney of record, for plaintiff. Richard N. Bagenstos and Alvord & Alvord, Washington, D. C., of counsel.

Robert M. Hollis, Washington, D. C. with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D. C., for defendant.

Before COWEN, Senior Judge, and DAVIS and NICHOLS, Judges.

## OPINION

### PER CURIAM: *

This case concerns the unsuccessful attempts of the Norfolk Naval Shipyard ("Shipyard") to dispose of a surplus portal dock crane through a sales contract with plaintiff, Peck Iron and Metal Co., Inc. Eventually, when plaintiff failed to remove the crane from the Shipyard, the contract was terminated and the crane scrapped. Plaintiff sues for breach of contract and the defendant counterclaims for its scrapping costs, liquidated damages, and breach of stipulation of settlement, the first two being claimed in the alternative. In each instance the issue of liability was severed for trial. The defendant prevails on plaintiff's case but cannot recover on its counterclaims.

---

* The court's opinion is based on that of former Trial Judge Bernhardt, with modifications and a partially different result.

The court adopts the trial judge's findings of fact, with some changes as indicated in the order entered this day, but they are not reproduced with this opinion. Any findings contained in the opinion that are not also embodied in the formal findings shall likewise be considered part of the court's findings.

The contract of August 12, 1966, under which plaintiff paid $7,351.73 for the crane required plaintiff to remove it from the Shipyard within 30 days. The plaintiff promptly made ready to do so but was halted by the Shipyard because Drydock No. 4 ("DD 4"), beside which the crane had been stored in the open for many years, was suddenly to be occupied by the Shangri La, a large aircraft carrier putting in for emergency repairs. The Shipyard's paramount obligation was to provide repair services to vessels of the Atlantic Fleet. Crane removal activities at DD 4 would interfere with simultaneous repairs to the Shangri La, and had thus to be subordinated.

The government thereupon issued a contract modification whereby it accepted responsibility and expense for loading the crane onto plaintiff's barge which was to be floated into the flooded DD 4 and moored alongside the crane location. The logistics were formidable. Heavy prospective costs disproportionate to the consideration involved, and other factors, caused the government to breach the modification. Conferences between the parties failed to result in agreement on moving the crane. The contract limited the government's liability for breach to returning the purchase money. In February 1967 the government cancelled the contract and refunded plaintiff the $7,351.73 purchase money.

Plaintiff filed suit here for breach of contract. *Peck Iron & Metal Co. v. United States*, Ct.Cl. No. 335–68. It was settled on the basis of a stipulation of March 5, 1970, and judgment was entered for plaintiff in the amount of $10,000 and title to the crane. The settlement stipulation required plaintiff to remove the crane from the Shipyard within 90 days (July 10, 1970) at its own expense and in a manner satisfactory to the Shipyard.

The sale had been handled by Defense Surplus Sales Office ("DSSO"), which neglected to give the Shipyard formal notification of the settlement of the suit until July 6, 1970, four months after the settlement. In the meantime the plaintiff had informally advised the Sales Contracting Officer ("SCO") at the Shipyard of the settlement. The SCO promised to make inquiries. The plaintiff cannot be blamed for failing to remove the crane from the Shipyard by the July 10, 1970, deadline prescribed by the settlement stipulation of March 5, 1970. The defendant had no intent to terminate the contract for delay.

When the Shipyard finally received official word of the settlement stipulation on July 6, 1970, the parties conferred. Plaintiff was instructed to submit to the Shipyard for approval a proposal describing how the crane was to be removed.

The only method of removal that was logistically and economically feasible, and which corresponded to the method which the government had planned to employ in 1966 when it had assumed removal responsibility under the modification to the original contract, was to lift the crane, either intact or in disassembled parts, onto a barge to be moored in a flooded DD 4, thence to be towed to plaintiff's adjacent wrecking yard. There is dispute as to the feasibility of other methods, such as moving the crane or its disassembled parts overland via temporary tracks or special wheeled vehicles to other locations in the Shipyard for deposit on a barge at the water's edge, or even moving the crane to Drydock No. 7 adjacent to DD 4 and thence lifting it onto a barge in Drydock No. 7 for removal by water. However, these alternatives were not practicable. The only practicable and economically justifiable method was to lift the crane or its disassembled parts onto a barge or barges floating alongside a flooded DD 4, and then to tow the loaded barge(s) to the plaintiff's waterside facility nearby the Shipyard. This was the method which both parties regarded at the time to be the most feasible.

On July 31, 1970, plaintiff submitted to the SCO a proposal for removal of the crane furnished by Williams Enterprises, Inc. Williams planned to bring its crane or cranes to the Shipyard from its facility near Washington, D. C., and deposit the subject crane onto plaintiff's barge moored in DD 4 in the manner described in the preceding

paragraph, although DD 4 was not expressly mentioned. At defendant's instance plaintiff furnished the Shipyard a more detailed description of the Williams proposal on October 14, 1970. The plan estimated that it would take 15 workdays (weekends and holidays excluded).

At a conference between the parties on November 18, 1970, an oral agreement was reached on the details of plaintiff's use of DD 4 for removing the crane. During some future exchange of vessels plaintiff would be given the use of DD 4 in a flooded condition for 2 to 3 days (referred to hereafter as a "window") to deposit the crane on a barge or barges moored alongside. Thirty days ahead of the window date plaintiff would be given a "tentative-tentative" notice of availability so that it could bring necessary equipment to the worksite and dismantle the crane for loading onto the barge(s). A more firm confirmation would be given 2 weeks ahead of the window. Seventy-two hours ahead of the window a fixed commitment to the window date would be given plaintiff, subject only to the possibility of emergency repairs to a vessel that could not have been anticipated. Conditions were imposed by the Shipyard, namely: The cranes brought in for the removal undertaking could not be operated less than 7 feet from the edge of the "bathtub."[1] Also, all manhole covers and grates on the DD 4 coping where the dismantlement and lifting were to take place must be bridged during the operation. Finally, the maximum load permitted on the coping would be 6,000 pounds per square foot. Plaintiff said it would consult Williams about these conditions. So far as the record reveals the conditions were presumably acceptable.

To appreciate the necessity for such close and indefinite timing, it should be noted that DD 4 was one of the busiest drydocks at the Shipyard. While routine maintenance for ships of the Fleet were scheduled long in advance, DD 4 had to be kept available for repairs to vessels in emergencies that could not be foreseen. In advance of the arrival of a vessel for drydocking DD 4 would have to be pumped dry and large blocks of varied size and configuration would be placed in the bathtub part of the drydock to fit the external shape of the incoming vessel. Water valves would then be opened to flood the drydock and thereby release the caisson which served as a seal at its otherwise open seaward end. The caisson would be floated aside, the vessel awaiting repairs would be towed in and lowered to rest on the blocks arranged in the bathtub, the caisson would be reattached to the open end of the drydock, and then compressors would pump the water out so the vessel could be worked on "in the dry." With the bathtub pumped dry the pressure of the seawater against the outside surface of the caisson would seal it solidly against the end of the drydock and minimize leaks. Upon completion of the vessel repairs, the bathtub would be again flooded by opening of valves, the caisson would be removed, the vessel depart, and the drydock would be readied for the next vessel. The sequence was repeated from vessel to vessel.

It was with these circumstances in mind that the Shipyard was to squeeze a window between scheduled vessel repairs for the plaintiff to use DD 4 in a flooded condition for removal of the crane. The chief reason for uncertainty until the last minute that the window date assigned would actually materialize was that the period for use of DD 4 for scheduled repairs of a vessel might be underestimated, since the full extent of needed repairs would often be unknown until the vessel could be inspected in the dry. Also, even if the repaired vessel departed on schedule there was always a realistic chance that another vessel would have to be accommodated for emergency repairs. Thus the only fairly safe date to select for a window for plaintiff to use DD 4 for crane removal had to be sandwiched in between vessels scheduled for routine maintenance. This narrowed the selection of an

1. "Bathtub" is vernacular for the recessed core of the drydock in which vessels are temporarily lodged while undergoing repairs.

available window considerably, and even then subjected the date selected to unavoidable uncertainty.

From the plaintiff's standpoint there was a good deal of unrelievable risk involved in accepting an assigned window for use of a flooded DD 4. It estimated that it would take about 14 or 15 working days and involve a cost of $16,000 to $20,000 to marshal sufficient lifting equipment at the worksite, including the disassembly of auxiliary lifting cranes for transport from a distant location, their travel to the DD 4 worksite, and their reassembly there to use in disassembling the subject crane and lifting its component parts onto a barge. Once the necessary equipment was at the worksite it would take an estimated 5 to 11 days to disassemble the subject crane, depending on whether metal reinforcement was encountered in breaking up and disposing of its large concrete counterweight. After the crane was completely disassembled it would take an estimated 2 or 3 days to lift the components onto the barge(s) moored alongside the flooded drydock and then to tow them out of DD 4 to plaintiff's nearby yard. The hourly charges for use of the hired lifting equipment and contractor's personnel would run about $400, so it behooved plaintiff to perform the removal from start to finish as rapidly as possible to curtail cost.

If during dismantlement of the crane circumstances caused cancellation of the assigned window the plaintiff would be forced to make a difficult and costly choice. It could either complete the dismantlement of the subject crane on the coping alongside DD 4, and then decide whether to retain the hired equipment at the worksite waiting for the next available window to be assigned, or it could cause the contractor to remove his equipment and then return it later to complete the loading part of the operation whenever the next window was assigned. Either way there were large potential costs involved to the plaintiff, so for this reason the timing of the window by the Shipyard, and adherence to it, would be of critical importance. The Shipyard would have permitted plaintiff to leave the dismantled components of the crane at the worksite if plaintiff's operations were interrupted because of official use of DD 4, but as explained this did not solve the cost problem if there was a hitch in plans.

The terms of the oral agreement of November 18, 1970, have been described earlier. The defendant agreed to draft a contract modification accordingly. A draft of a proposed modification was furnished plaintiff on December 31, 1970, for comment and concurrence. The draft is not in evidence and it cannot be determined whether it fully corresponded to the oral agreement. There is some dispute as to this, but it is reasonable to conclude from all the facts that any departures from the oral agreement were not significant and were susceptible to resolution. Plaintiff did not submit its comments on the proposed modification until February 19, 1971, demanding a 3-day window for use of a flooded DD 4 instead of a 2-day window preferred by defendant, plus a penalty of $50 per hour beyond that. A formal written modification was never effectuated.

In the meantime a series of windows were proffered to plaintiff by the defendant. The first one was for December 3, 4, and 5, 1970, which was offered at the conference on November 18, 1970. The Shipyard commander considered it to be "unreasonably tight", since it gave very little time for plaintiff to get ready. Plaintiff said it would consult its moving contractor, which it did, and informed defendant that the proffered window of December 3–5 could not be met. Plaintiff was entirely justified in its refusal. The offer of a 3-day rather than a 2-day window corroborates plaintiff's version of the nature of the oral agreement of November 18, 1970, rather than the defendant's which apparently tried to narrow the window to 2 days in drafting a written modification purporting to reflect the oral agreement.

When plaintiff declined the December 3–5 window on November 20, 1970, it was offered on a "tentative-tentative" basis a window on or about January 16, 1971, which

due to lack of available equipment plaintiff declined and requested another date. It was then offered a window for about February 23 which it said it would work toward. Because of the inclement weather working in the winter months was less attractive to plaintiff than the balance of the year. Due to Shipyard requirements the February 23 window was cancelled. On January 25 plaintiff was informed that the next tentative window would be March 14–16. On March 5 an emergency use of DD 4 caused the defendant to cancel the window of March 14–16. In any event about the same time plaintiff advised defendant that it could not meet the March date.

Plaintiff then inquired of the defendant when the caisson would be removed from DD 4 for repairs and maintenance. Caissons were scheduled for routine maintenance every 4 or 5 years. During the 3 or 4 weeks while a caisson is absent from its drydock for maintenance the drydock is perforce in a flooded condition and rarely in use. At the conference of November 18, 1970, plaintiff had been told that the caisson for DD 4 was scheduled for maintenance in May 1971, which would afford an opportunity for plaintiff to remove the crane without competition from vessels under repair. At that time plaintiff wanted to remove the crane as soon as possible, and was not interested in postponing the removal to May 1971. However, in early March 1971 plaintiff asked when the DD 4 caisson would be removed for maintenance so that it could use the drydock for several weeks without interruption, but on April 2 was informed that the removal of the caisson was to be postponed because of pressing needs for DD 4. The caisson was not actually removed for repairs until December 22, 1971, long after the contract in suit was terminated and the crane scrapped by defendant.

On April 2, 1971, the SCO notified plaintiff that the next tentative date for a window would be about June 15 (a 3-day window) subject to being made relatively firm by June 1 and made firm 72 hours prior to the window. Plaintiff was instructed to inform the SCO by April 30 whether the arrangement was acceptable. Plaintiff was also told that it would be required to remove the crane from the Shipyard within 90 working days from April 2—or August 10, 1971—and that if it was not removed by June 15 by water via DD 4, then thereafter it would have to be removed in some other way entailing overland movement via rail or roadway. In such case State permits would be required and the plaintiff would have to submit detailed plans to the Shipyard for approval.

On April 16 plaintiff responded to the SCO's letter of April 2 but made no reference to whether the proffered June 15 window was acceptable. Instead it accused defendant of refusing to implement the settlement stipulation of March 5, 1970, and asked when DD 4 would be available to it "for an indicated 90-day availability period." Neither the original contract nor the settlement stipulation of March 5, 1970, gave plaintiff any express right to use DD 4 or any other Shipyard facilities for removal of the crane, although it was tacitly assumed that DD 4 would be used. The requirement of the settlement stipulation and of the SCO's letter of April 2, 1971, that plaintiff remove the crane within 90 days was not tantamount to giving plaintiff use of DD 4 for an uninterrupted period of 90 working days, as plaintiff's letter of April 16 might imply. Rather they merely established a time limit *within which* the crane had to be removed from the Shipyard. The oral agreement of the parties at the conference of November 18, 1970, specified the details and conditions of any removal undertaking, and it was incumbent upon plaintiff to operate within those limitations, just as it was the obligation of the defendant to give plaintiff advance notice of any assigned window and to adhere to the notice in the absence of unforeseen circumstances. The only part of the 90 days during which plaintiff under the terms of the oral agreement would be entitled to use DD 4 would be the 5 to 11 days prior to the assigned window when it would be setting up equipment and dismantling the crane, followed by 2 or 3 days to use DD 4 in a

flooded condition for the brief purpose of depositing the disassembled parts of the crane onto a barge or barges, and moving them out of DD 4.

Even though plaintiff had failed to notify the SCO by the April 30 deadline as to whether the June 15 window was acceptable, on May 27 the SCO advised plaintiff that it would still be permitted to use DD 4 for 72 hours about June 15, and requested a response from plaintiff by June 2, failing which it would be assumed that plaintiff intended to remove the crane without utilizing DD 4, in which case plaintiff would have to submit plans to the Shipyard for approval.

The plaintiff's reply of June 1 to the SCO still failed to reveal whether it intended to use the assigned DD 4 window of June 15 and alleged that defendant had given no firm date for use of the drydock. On June 4 the SCO further extended to June 7 the deadline for plaintiff to inform whether it intended to use the June 15 window proffered it, and plaintiff was warned that it would be held to respond in damages for default. Plaintiff's response of June 10 reiterated that it had received no specific time to use DD 4 and asked for a firm date for its availability, requesting also that the SCO issue findings of fact. On June 16 the SCO issued such findings, advised plaintiff of its appeal rights, and repeated that plaintiff had until August 10, 1971, to remove the crane in some manner not involving the use of DD 4.

Plaintiff wrote the SCO on July 28 that it intended to start removing the crane by August 2. The SCO reminded it that it could no longer use DD 4 for crane removal and would have to submit to the Shipyard for approval its plans to remove the crane in any other fashion. When plaintiff was denied access to DD 4 on August 2 to commence removal activities it complained, and the SCO reminded it again that removal plans would require Shipyard approval.

Because the crane had not been removed by the August 10, 1971, deadline, on the following day the SCO declared plaintiff to be in default and warned that, unless the default was cured by August 26 as the contract provided, plaintiff would lose title and would be liable for storage charges. The default not having been cured by August 26 the next day legal custody of the crane was turned over to DSSO by NSC, which returned the crane to the Shipyard for disposal as scrap.

In the meantime on August 20, 1971, plaintiff filed its complaint with the Armed Services Board of Contract Appeals ("ASBCA" or "Board") appealing from the adverse decision of the SCO of June 16. It contended that it had been denied reasonable access to use DD 4 and demanded that the Shipyard be required to give it 90 days' use of DD 4 in a flooded condition. While the case was pending before the Board the crane was scrapped by the Shipyard starting September 14, 1971, at a cost to defendant of $14,747. On November 4, 1971, the Board dismissed the appeal because it sounded in breach of contract over which the Board had no jurisdiction, since there was no remedy provided under the contract. Nor did the Board have jurisdiction to reinstate the contract, the plaintiff's right to the crane having been lost by terms of the contract when it failed to remove the crane within the 15-day cure period issued by the SCO.

The issues governing the case in chief, essentially factual in nature, are whether the Shipyard provided plaintiff sufficient opportunity to remove the surplus crane and, if so, whether plaintiff defaulted by failing to remove it.

Following the conference of November 18, 1970, at which the parties reached agreement on the manner in which plaintiff was to remove the crane, the government specified a series of tentative dates—windows as we term them for convenience—for plaintiff to use DD 4 in a flooded condition for the removal operations. These dates were December 3–5, 1970, January 16, 1971, February 23, 1971, March 14–16, 1971, and finally, June 15, 1971. Each of the windows covered 3 working days. The windows provided in December 1970, and in February and March 1971 were either withdrawn or

did not give plaintiff sufficient notice, so they could not represent removal opportunities to charge against plaintiff. That leaves for consideration the windows proffered in January and June 1971.

The January 16 window was proffered to plaintiff on November 20, 1970, long in advance of the target date, but plaintiff declined it due to lack of available equipment. The details of this reason are not presented in the record and, it being the plaintiff's burden, the plaintiff can properly be charged with responsibility for its failure in accepting the date. It is known that plaintiff preferred not to perform the removal operations during inclement winter months, but that reason without more would not suffice as an acceptable excuse.

The next—and last—opportunity for crane removal was the window of June 15, 1971, which was offered to plaintiff on April 2, 1971, far longer notice than the 30-day notice required by the parties' oral agreement of November 1970. The offer of the June 15 window specified, consistent with the November 1970 agreement, that the date would be made more firm by June 1, 1971, and would be made firm 72 hours ahead of the target date. Despite the fact that plaintiff was directed to notify the Shipyard by April 30 as to whether the June 15 window was acceptable, the plaintiff's letter of April 16 made no response to the offer and instead demanded to know when DD 4 would be made available to it "for an indicated 90-day availability period." We have remarked earlier that this demand was a misreading of the settlement stipulation of March 5, 1970, which specified the 90-day period only as the time within which the crane was to be removed, and was not intended to convey the right for plaintiff to have the exclusive use of DD 4 for 90 consecutive workdays in removing the crane.

Plaintiff also made a nonresponsive reply of June 1 to defendant's letter of May 27 holding the June 15 offer open provided plaintiff accepted by June 2. Defendant again extended the acceptance deadline to as late as June 7, with still no responsive reaction from plaintiff other than a repeated demand that a firm date be made for the availability of DD 4.

The major reason plaintiff gives for failing to use the June 15 window which had been offered it is that the letter containing that offer added that if the June 15 date "is not acceptable to you," the crane would thereafter have to be removed without use of DD 4. That limitation, plaintiff avers, was arbitrary and unlawful. We can assume that this is so ( see the discussion infra) but nevertheless that improper "ultimatum" did not excuse plaintiff from using the June 15 window, if it reasonably could. There is no evidence that Peck Iron and Metal could not utilize that period, if it had wanted to do so, and the existence of an improper limitation on future activities could not, and did not, preclude Peck from making use of the June period. If plaintiff feared that it would be bound by· the improper condition even if the June window had to be cancelled by the Government at the last minute, the correct response would have been to accept the June 15 window but disavow the limitation on later activities which Peck reasonably considered to be erroneous. There was nothing to prevent that course, but plaintiff did not take it, or indicate in any way that the June 15 period was acceptable to it, but that it did not consider itself tied by the additional restriction if removal could not be effected in June (through no fault of Peck's). We must conclude, therefore, that plaintiff did not fulfill its obligation when it failed and refused to remove the crane in June, as it could and should have.[2]

---

**2.** Plaintiff, pointing out that the April 2d letter also said: "If the June date is acceptable to you, please let us know not later than 30 June 1971 *so that the necessary paper work can be effected*", insists that the emphasized portion of the sentence meant that Peck would have to agree to a written version of the oral agree-

ment—to the terms of which it objected—before it could use the June 15 window. We have no adequate reason for thinking that the simple words "so that the necessary paper work can be effected" (which would seem to relate to government paper work necessary to the use of DD 4) carried that special meaning—especially

That failure, an important and material one, bars it from recovering any damages from the Government, especially since plaintiff had already failed, without proper excuse, to use the January window offered to it.

We come then to defendant's counterclaims. Defendant now concedes that any recovery by it is limited to liquidated damages of $1,470.35.[3] We hold, however, that defendant is precluded from recovering even this sum, because there is substantial reason to believe (and defendant has not shown otherwise) that plaintiff was prevented from removing the crane during the rest of the 90-day allotted period by reason of the Government's improper imposition (in its letter of April 2nd, *supra*) of the requirement that any removal after the June 15 window would have to be effected (by August 10, 1971) without the use of DD 4. There is no proof, and little indication, that DD 4 was (or would be) unavailable later in June, in July, or in early August. Excluding plaintiff from the drydock and requiring it, instead, to use rail and road facilities would probably have increased Peck's costs substantially and, in any event, would not have been a feasible or practicable alternative. This was not a proper directive on the part of the Government unless the use of DD 4 (after June 15) was precluded by other uses—and this has not been affirmatively shown. Though this improper limitation did not (as we have said) preclude plaintiff from making use of the June 15th window (as it should have done), that erroneous limitation may very well have prevented Peck from thereafter removing the crane. Because the defendant's own wrongful restriction may have barred later compliance, the Government cannot recover liquidated damages due to the plaintiff's failure to remove the crane within the prescribed period.[4]

For these reasons, neither party can recover. Plaintiff's petition and defendant's counterclaims are dismissed.

## CONCLUSION OF LAW

Upon the findings and opinion the court concludes as a matter of law that plaintiff is not entitled to recover and, therefore, the petition is dismissed. Defendant's counterclaims are also dismissed.

NICHOLS, Judge, concurring:

I concur in the judgment and in the court's per curiam opinion, but add the following observations.

Once in a while it becomes necessary for compelling reasons of state that the government breach a contract it has previously entered into. Usually it has covered itself with suitable termination articles, but sometimes this precaution has been neglected. When such a breach occurs, it is still a breach, despite the high reasons of state that may have brought it about. *Everett Plywood Corp. v. United States*, 227 Ct.Cl. ——, 651 F.2d 723 (1981). The most that statecraft can demand is that no punitive damages shall be awarded and monetary relief, not specific performance, shall be the remedy. In substance, if not technically, the government has taken the contract and the short word for the aggrieved contractor's entitlement is just compensation.

The relevancy of this is that on April 2, 1971, our plaintiff and the naval shipyard were in this position: implementation of the March 5, 1970, stipulation had proven far more difficult than anyone had anticipated. To remove the crane intact as plain-

---

since plaintiff never inquired about the matter or explored it at the time.

We have considered plaintiff's other arguments why it did not breach the agreement, but find them either unpersuasive or irrelevant.

**3.** The Disputes Clause of the reinstated contract specifically provided that the maximum sum recoverable by the Government for plaintiff's failure to remove the crane was the "for-

mula amount," *i.e.* liquidated damages (20% of the purchase price of the item).

**4.** We do not consider that the record sufficiently supports a finding that plaintiff could not have removed the crane after June 15th, even if DD 4 had been offered to it. Conversely, the record does not sustain the opposite finding that plaintiff would in fact have done so. Both parties have failed in their burdens of proof.

tiff wished to do and supposed it had stipulated for, plaintiff had to send equipment in advance and float it into drydock No. 4, and had to be allowed a working time of 72 hours, what is called in this case a "window." The drydock in question was in intensive use for its primary function of repairing and refitting major Navy ships. Possible "windows" came in view only rarely between the undocking of one ship and the docking of another. The Navy had designated some "windows" it failed to open when the selected time came. Plaintiff had had to reject others and explanation of such rejection was hardly required in view of the arrangements with third parties the Navy knew plaintiff would have to make. The Navy hardly would have expected that such third parties would always be standing by, ready and eager to perform.

Thus, on April 2, 1971, experience had pretty strongly suggested a doubt whether the stipulation could or would ever be performed. The court calls the April 2, 1971, SCO letter an "ultimatum," a term I think originally suggested from the bench by me. An ultimatum, in international diplomacy, is a demand to which the maker does not expect compliance—and would be disappointed if compliance resulted—but which he means to use as the opening move in all-out war. The eccentric with an interest in history will recall the Austro-Hungarian "ultimatum" to Serbia, after the assassination of the Austrian Archduke, that was the trigger act of World War I. In its more restricted sphere, the SCO letter was an ultimatum. An ultimatum is never resorted to by one in any sphere who hopes that peaceful and cooperative relations will continue, for the obvious reason that even a proper demand becomes unacceptable if it is couched in ultimatum form.

The SCO's April 2, 1971, letter begins with a one-sided and accusatory recital of relations between the parties, seeking to show (but hardly expecting to convince) that all the delays in implementing the stipulation hitherto have been the fault of plaintiff. It does not mention, of course, that no one even bothered to notify the shipyard commander of the stipulation until the original 90 days had almost run. It does not mention that "window" after "window" was offered to plaintiff and then closed off. Then, in the operative part, it offers one more "window" in the usual terms reserving the right to close it unilaterally, and says if plaintiff does not accept that, or if plaintiff does accept it, but defendant unilaterally decides to close this "window," there will be no other. Plaintiff will then have to remove its crane by what both sides have recognized to be uneconomic and unfeasible means, or lose it.

We all agree that if, hypothetically, defendant had closed the June 15 window, and refused, as it said it would, any other, it would have been in breach, and plaintiff would be entitled to recover breach damages. It seemed to me, until I was persuaded otherwise, that this April 2, 1971, letter was itself a breach and plaintiff would have needed no more. However, we have held in *Pauley Petroleum, Inc. v. United States*, 219 Ct.Cl. 24, 591 F.2d 1308, *cert. denied*, 444 U.S. 898, 100 S.Ct. 206, 62 L.Ed.2d 133 (1979), that a party is not allowed to be trigger-happy in declaring the government in breach. The breach must be real and present, not just feared or threatened. Thus plaintiff should have prepared to make use of the June 15 window, or given notice of good reasons why it could not do so. Plaintiff was not a sovereign nation: it was dealing with the sovereign, and a sovereign with understandable problems.

In any case, a palpable present breach is waived by a failure to declare the contract at an end, and instead a continued effort to perform and benefit by performance. *Ling-Temco-Vought, Inc. v. United States*, 201 Ct.Cl. 135, 475 F.2d 630 (1973). Thus, a party confronted with a present or threatened breach by the United States has got to take its stance at the proper time, not too soon, and not too late, and in the proper way. Plaintiff, as I read its responses, recognized that friendly and cooperative relations were at an end, and the parties had become adversaries again. But its reactions

were those of the squid, not of the forthright contractor who wins breach cases in the Court of Claims. There was a preposterous demand for use of the dock for 90 consecutive days, which, of course, plaintiff never expected to obtain. There was a failure to advise whether plaintiff would or would not use the June 15 "window" that was offered to it. As I see it, the breach claim could have been perfected by a forthright response to the April 2, 1971, letter, in which plaintiff either declared its willingness to use the June 15 window, or else said it could not for reasons stated, and reserved its right to prosecute a breach if the June 15 window were closed and no other provided. The response plaintiff actually made played into defendant's hands and provided all the excuse needed to let defendant out of its stipulated commitments.

The court has eliminated, and I agree, a number of statements in the trial judge's recommended opinion, intimating or hinting that plaintiff's enthusiasm for getting the crane was superseded at an early date by its enthusiasm at the prospect of another lawsuit. Apart from the fact no one in his right mind welcomes being a party to a lawsuit such as this, I think defendant wanted out of the stipulation at an earlier date than plaintiff, and did its best, and successfully, to jockey or provoke plaintiff into unwise moves that would cost it both lawsuit and crane. Defendant did not forthrightly acknowledge it had stipulated to do something close to impossible for it to do in fact. While one says defendant is liable for breach of the contracts it has gone into the marketplace to make, no matter how high-minded the reasons for the breach, one must also say that under such circumstances, those who would pin breach liability on the government have got to turn square corners.