### HEDSTROM LUMBER COMPANY, INC.

v.

### The UNITED STATES.

No. 116–81L.

United States Claims Court.

Dec. 10, 1984.

Michael K. Donovan, Duluth, Minn., for plaintiff.

James T. Draude, Washington, D.C., with whom was Asst. Atty. Gen. F. Henry Habicht, II, Washington, D.C., for defendant.

## OPINION

YOCK, Judge.

This condemnation case arises under the provisions of the Boundary Waters Canoe Area Wilderness Act (BWCAW Act), Pub.L. No. 95–495, § 6(b)(2), 92 Stat. 1649, 1653 (1978). Pursuant to the BWCAW Act, the plaintiff's Laurentian timber sale contract was terminated by the U.S. Forest Service. Thus, the plaintiff was denied the opportunity to log the Laurentian sale under the terms of the contract. Liability has been conceded by the defendant, resulting in this Court being presented the sole issue of what constitutes a proper measure of damages for the defendant's taking of the plaintiff's contract.

After considering the entire record in this case, the Court has concluded that the plaintiff is entitled to $15,643.39 plus interest as just compensation for the termination of the Laurentian contract on January 16, 1979, pursuant to section 6(b)(2) of the BWCAW Act. In addition, the plaintiff is entitled to $4,691.15 as compensation for its costs in directly fulfilling the terms of the terminated contract.

### Facts

The Boundary Waters Canoe Area Wilderness (BWCAW) is part of the Superior National Forest located in northeastern Minnesota and lies along the international border with Canada. It is complemented

on the Canadian side of the border by the Quetico Provincial Park. The BWCAW is the largest wilderness area east of the Rocky Mountains and is the only lakeland canoe area wilderness in the nation. Located within the BWCAW are over 1,000 lakes linked by hundreds of miles of streams and short portages. Despite the area's relative isolation, it is the most heavily visited wilderness area in the national wilderness system and has been described as being a hauntingly beautiful area of the United States. *See Snowbank Enterprises, Inc. v. United States*, 6 Cl.Ct. 476 (1984).

The Federal Government has long recognized the unique quality of this lake country wilderness, beginning over three-quarters of a century ago to insure its preservation. Initially, preservation of this area was undertaken when certain federal land was set aside as a forest reservation. Additional acreage was reserved in 1905 and 1908, and it was from these lands that President Theodore Roosevelt proclaimed the Superior National Forest in 1909. Additional lands were added to the forest reservation in succeeding years. The first wilderness designation came in 1926, with the Secretary of Agriculture placing severe restrictions on road building and commercial logging. Thereafter, congressional action to protect the area included: the Shipstead-Nolan Act of 1930, 16 U.S.C. §§ 577–577b, which protected the area's lakeshores by prohibiting the building of dams; the Thye-Blatnik Act of 1948, 16 U.S.C. §§ 577c–577h, which appropriated funds for the acquisition of privately-owned holdings scattered throughout the area; and the Humphrey-Thye-Blatnik-Andersen Act of 1956, 16 U.S.C. §§ 577d–1, 577g–1, and 577h, which extended the Thye-Blatnik Act.

In 1930, Congress first began to impose total bans on logging in designated portions of the Superior National Forest. In 1956, Senator Hubert H. Humphrey, of Minnesota, introduced the first version of a bill that ultimately was enacted as the Wilderness Act of 1964, S. 4013, 84th Cong.2d Sess., 102 Cong.Rec. 9775 (1956). Thereafter, in 1958, the area was redesignated as the Boundary Waters Canoe Area (BWCA).

In 1965, pursuant to regulations promulgated by the Secretary of Agriculture, the BWCA was divided into an "Interior Zone," in which logging was totally prohibited, and a "Portal Zone," in which continued logging was permitted. 36 C.F.R. § 251.-84(a).

In 1978, Congress enacted the BWCAW Act, extending the boundaries of the BWCA to include an additional 45,500 acres and redesignating it as the Boundary Waters Canoe Area Wilderness. The BWCAW Act prohibits logging in the entire BWCAW (section 4(a) and (b)) and expressly directs the Secretary of Agriculture to terminate all existing timber contracts in the BWCAW (section 6(a)). 92 Stat. 1650, 1652.

There were seven timber contracts outstanding within the boundaries of the BWCAW at the time of passage. The contract here at issue, the Laurentian timber sale, was one of those seven contracts, since it was within the new boundaries of the BWCAW as defined in the BWCAW Act.

Section 6(b)(2) of the BWCAW Act provides, in relevant part that:

The United States will pay just compensation for contracts terminated or modified by this Act, consistent with Amendment V to the Constitution of the United States. Losses due to costs incurred in directly fulfilling the terms of such contracts shall be paid by the United States * * *.

The plaintiff, Hedstrom Lumber Company, Inc., is a family-owned Minnesota corporation with its principal place of business located on the Gunflint Trail five miles north of Grand Marais, Minnesota. The plaintiff is engaged both in logging and in operating a sawmill, which has manufactured a variety of wood products since 1914. The plaintiff's facilities include a sawmill, dry kiln, and planing mill. Fire destroyed the dry kiln in 1979 and the sawmill in 1981. The dry kiln has since been rebuilt, and, at the time of trial, a new sawmill was under construction. In the

early years of its operation, Hedstrom's mill operated on a seasonal basis until the early 1960's, when it began carrying on operations throughout the entire year.

In the course of its lumber business, Hedstrom purchases both sawtimber and pulpwood. The sawtimber is processed by Hedstrom into merchantable lumber and then sold at both wholesale and retail. All of the pulpwood is sold to pulp mills, since it is unsuitable for processing into merchantable lumber.

Originally, Hedstrom did most of its own logging to meet the needs of its sawmill. However, beginning in the late 1950's and continuing through the mid-1970's, Hedstrom purchased almost all of its sawtimber from independent loggers and pulp companies.[1] Hedstrom revived its own logging operations in 1978.

Hedstrom enters into timber sales contracts, under which it conducts its logging operations in northeastern Minnesota, with federal, state, and local governments as well as with private parties. Canada, although relatively near by, prohibits the export of sawtimber and thus is not an available source of sawtimber from which the plaintiff can draw. The purpose of these timber sale purchases, and the logging operations conducted thereon, is to keep Hedstrom's sawmill in operation all year, especially during "spring breakup." This period runs from March 15th to June 1st, during which time road conditions make travel difficult and most independent loggers close down their operations. As a result, the plaintiff's purchase of timber becomes exceedingly difficult and forces the plaintiff to stockpile the necessary surplus. Most of the plaintiff's timber supply is acquired by purchase from independent loggers, with Hedstrom's own logging operations being relied upon to create a stockpile for use in times of market shortage in order to maintain a constant supply of timber for production purposes.

Traditionally, Hedstrom has tried to obtain its timber from within the nearby Gunflint and Tofte Ranger Districts of the Superior National Forest. Both the Gunflint and Tofte Ranger districts are located in Cook County, Minnesota, which is where the plaintiff's sawmill is located. The close proximity of these districts to the Hedstrom sawmill minimizes transportation costs, making the logging operations more economical. However, the various restrictions on logging in these areas have forced Hedstrom to obtain its sawtimber from more distant ranger districts.

Prior to the mid-1970's, Hedstrom operated almost exclusively as a white pine sawmill, using other species of timber such as white spruce, white birch, and ash as necessary. White pine remains the choice, and most profitable, species of sawtimber. Most of the white pine used by Hedstrom was obtained from the Gunflint and Tofte Ranger Districts, although, since 1975, the plaintiff has gone both to the Isabella Ranger District (located in Lake County, Minnesota) and to Orr, Minnesota, some 165 miles away from its sawmill, for "old growth" white pine.[2] While preferring to log old growth white pine for its finer quality and greater production values, Hedstrom has also been using "second growth" white pine since the 1960's. The overall effect of Government restrictions since 1941 has been, by plaintiff's estimate, to cut the supply of white pine available to the Hedstrom sawmill in half.

Nonetheless, white pine is still available to Hedstrom and from the evidence of record the operation of its mill does not appear to have suffered as a result of Government regulation. While the supply of nearby white pine may have been reduced, the capacity of the sawmill has ex-

---

1. It is unclear from the testimony at trial whether such change was gradual or more abrupt. However, it is clear that, by the early 1970's, Hedstrom purchased almost all of its sawtimber from independent contractors.

2. "Old growth" white pine is white pine in the category of 150 years or older and of a size approximately 18 inches to 36 inches in diameter. "Second growth" white pine ordinarily has a diameter of 8 to 16 inches at breast height and is between 60 and 100 years old.

panded and the plaintiff has moved to process more different types of species in addition to white pine. At the time of trial, the total annual capacity of the Hedstrom sawmill was 10,185 Ccf (hundred cubic feet)[3] based on one eight-hour shift, five days a week, fifty weeks a year.

Hedstrom's audited financial statements show that for the year ending December 31, 1978, Hedstrom had a net income of $159,320; for the year ending December 31, 1979, it had a net income of $139,992; and for the year ending December 31, 1980, it suffered a net loss of $31,049.

In September of 1974, the Forest Service advertised for bid the Laurentian timber sale in the Gunflint Ranger District. The sale included five clearcutting units located in Sections 26, 27, 28 and 29, Township 65 North, Range 2 West, near the Gunflint Trail. No bids were received as of October 22, 1974, the date of bid opening. On December 4, 1974, North Shore Forest Products, Inc., (North Shore) bid for the Laurentian contract at the advertised rate and paid a deposit of $100. The bid was accepted by the Forest Service and the parties entered into Sale Contract No. 09–1858 (the Laurentian contract).

Under the terms of the Laurentian contract, North Shore was entitled to cut and remove from each designated clearcutting area those trees meeting the minimum specifications stated in the contract. The estimates of available timber in the sale area were based on a timber cruise performed by the Forest Service in 1974. A flat rate for each clearcutting area, known as a stumpage payment, was to be paid to the Government as the price of the uncut timber. The total stumpage payment due under the Laurentian contract was $8,693.49.

In addition, North Shore was contractually obligated to reconstruct 0.6 miles of Forest Road No. 317 and to construct 0.5 miles of new forest road to be designated Forest Road 1415 in the Laurentian con-

tract area. Completion of this construction would entitle North Shore to a road "purchaser credit" of $3,175 against the stumpage payments due under the contract. In any case, the Laurentian contract required complete performance by June 30, 1979.

In 1978, with 14½ months of the contract term remaining, North Shore began to liquidate its business. As a result, the plaintiff, after walking through all of the blocks of the Laurentian sale, entered into a third party agreement with North Shore whereby Hedstrom purchased the sale and assumed the rights and obligations of North Shore under the contract. The plaintiff was greatly impressed by the quality and quantity of the timber on the sale, especially the old growth white pine. The Forest Service approved of this third party agreement on August 8, 1978. The only consideration paid by Hedstrom to North Shore was $100 as reimbursement for the deposit paid originally by North Shore to the Forest Service.

After the Forest Service approved the plaintiff's third party agreement, a modification of the Laurentian contract was agreed upon by the plaintiff and the Forest Service in recognition of a change in the contract's road construction requirements. This new agreement, dated January 9, 1979, reduced the total purchaser credit available under the contract to $2,883.

While Hedstrom's interest in the Laurentian contract revolved around the cutting of the sawtimber on the sale (especially the old growth white pine), the contract required the cutting of both sawtimber and pulpwood. For this reason, Hedstrom entered into a contract with the Great Lakes Paper Company (Great Lakes) to supply Great Lakes with pulpwood from the Laurentian sale. In addition to the agreed upon contract price, Hedstrom was entitled to a $1/cord bonus for aspen and a $2/cord bonus for softwood after certain specified minimum quantities of pulpwood were delivered. The $1 bonus was incorporated in

---

**3.** For convenience, all timber volumes in this opinion are stated in hundred cubic feet (Ccf), known as "cunits."

the original contract with Great Lakes dated August 1, 1978, but the $2 bonus was not added until January 22, 1979, and applied only to softwood delivered after January 1, 1979.

Hedstrom intended to log the Laurentian sale in December of 1978 and in the early months of 1979. The entire sale would have been cut as a priority because of the approaching spring breakup season and the impending expiration of the Laurentian contract on June 30, 1979. All of the sawtimber from the Laurentian sale would have been processed at the Hedstrom mill and all of the pulpwood would have gone to Great Lakes.

In October of 1978, the plaintiff began work on the road construction and reconstruction pursuant to the contract. However, numerous problems developed during the course of construction, which resulted in the road being only approximately 88 percent complete at the time of termination of the contract. Nonetheless, the roads were usable for logging at the time of contract termination.

In December of 1978, Hedstrom was orally informed by the Forest Service that the Laurentian timber sale was included in the BWCAW and that logging would not be permitted in the sale area. Prior to this time, no timber had been logged on the Laurentian sale by either Hedstrom or North Shore. Formal notification of the termination of the Laurentian contract was made by the Forest Service to the plaintiff on January 16, 1979.

At the time of the termination of the Laurentian contract, Hedstrom held eight other timber sales contracts within the Superior National Forest that were not included within the BWCAW and that were still available for harvest. Two of these sales, Choice Pine and Libra, contained more white pine sawtimber individually than did the Laurentian sale; however, the white pine was second growth rather than the old growth found on the Laurentian sale. In any event, in December of 1978, these sales were not ready for immediate logging because access roads had not been completed

and the movement of men and equipment would have been hindered by the need for significant snowplowing operations. Despite the unavailability of its other sales upon termination of the Laurentian contract, Hedstrom was able to maintain its sawmill operations by purchasing the needed timber on the open market.

On October 16, 1979, Hedstrom submitted a claim for $198,526 in contract damages to the Forest Service, allegedly incurred due to the termination of the Laurentian contract pursuant to the BWCAW Act. By letter dated November 30, 1979, the Chief of the Forest Service offered payment of $7,447.92 as compensation under the Act. The amount of compensation offered by the Government was calculated in the same manner as the compensation offered and accepted by the timber contractors on the six other sales terminated by the BWCAW Act. Hedstrom rejected the defendant's offer and the Forest Service, in turn, rejected the plaintiff's claim. The present litigation followed.

The parties agree that Hedstrom is not entitled to replacement timber as provided in section 6(b)(1) of the BWCAW Act. The parties are also in agreement that the termination of the Laurentian contract constituted a breach of contract. However, the plaintiff and the defendant differ as to the measure of damages available as a consequence of that breach. The plaintiff seeks common law damages for breach of contract, including anticipated profits. The defendant, on the other hand, argues that the plaintiff's damages are limited to those made available in the BWCAW Act, namely just compensation and costs incurred in fulfilling the terms of the contract.

After several modifications of its claim, the plaintiff now seeks total damages in the amount of $56,687 under section 6(b)(2) of the BWCAW Act. The plaintiff has included in this amount: (1) its anticipated profits on the sale of finished lumber milled from the sawtimber that would have been cut from the Laurentian sale ($39,-191); (2) its lost profits from the sale of the pulpwood from the Laurentian sale to

Great Lakes ($12,930); and (3) its actual road construction costs ($4,566).

In contrast, the defendant maintains that the plaintiff is entitled, as just compensation under the BWCAW Act, to: (1) the cost of replacement timber less the total stumpage payment due under the Laurentian contract ($4,633.32); (2) a percentage of the earned purchaser credit for road construction otherwise available under the contract ($2,681.80); and (3) miscellaneous costs (the contract deposit and the cost of the plaintiff's performance bond) incurred in directly fulfilling the contract ($132.50). The total amount due Hedstrom, according to the defendant, is $7,447.62.

*Discussion*

I. *Sovereign Act*

■ It is an accepted principle of contract law that neither party to the contract will do anything which would prevent, hinder, or delay performance by the other party. *Sun Oil Co. v. United States*, 215 Ct.Cl. 716, 740, 572 F.2d 786, 801 (1978); *Wah Chang v. United States*, 151 Ct.Cl. 41, 49, 282 F.2d 728, 733 (1960). An exception, however, is allowed in the case of a sovereign act undertaken by the United States. The sovereign act exception was enunciated by this Court's predecessor in *O'Neill v. United States*, 231 Ct.Cl. 823, 826 (1982), which stated that:

(A)pplication of the sovereign act doctrine has proceeded from the recognition that in governing the country, the Government's actions, otherwise legal, will occasionally incidentally impair the performance of contracts. Were those contracts exclusively between private parties, the party hurt by such governing action could not claim compensation from the other party *for the governing action.* Given the large number of contracts the Government enters, *its* contracts will sometimes be affected by those same governing acts. The policy underlying the sovereign act doctrine is that in those circumstances, *the Government in its contracting role, like its private counterpart, should not incur liability for its act done in the governing role.*

■ Thus, when the Government interferes by sovereign act with the performance of a contract to which the Government is a party, the Government will not be held liable for breach of contract. The test for determining whether a Governmental action is a sovereign act is whether the action was taken in the national interest and had "public and general" application. *Wunderlich Contracting Co. v. United States*, 173 Ct.Cl. 180, 196, 351 F.2d 956, 967 (1965). *See also Horowitz v. United States*, 267 U.S. 458, 45 S.Ct. 344, 69 L.Ed. 736 (1925); *Jones v. United States*, 1 Ct.Cl. 383 (1865). The judicial guidelines, however, for determining the existence of a sovereign act "are not susceptible to mechanical application." *Wah Chang v. United States, supra*, 151 Ct.Cl. at 51, 282 F.2d at 735.

The plaintiff contends that the termination of the timber contracts pursuant to the BWCAW Act was not a sovereign act within the above definition, since the BWCAW Act affected only a limited number of such contracts in a defined geographical area. Therefore, the plaintiff argues that the implementation of the BWCAW Act does not constitute a sovereign act, since it did not have general application. Moreover, the plaintiff argues that contracts may be terminated, without the Government being liable for damages for breach, only in cases of national emergency.

In this case, both parties point to *Everett Plywood Corp. v. United States*, 227 Ct.Cl. 415, 651 F.2d 723 (1981), as support for their respective positions. In that case, the plaintiff sought damages for breach of contract following the Forest Service's termination of a timber sale contract. The Forest Service decided to terminate the contract only after it became apparent that continued logging and associated road construction would result in massive earth mantle failures with resulting soil and watershed damage. The *Everett Plywood* court held that the termination for environmental reasons was a breach of contract and that the Government was not insulated

from breach damages under the sovereign act exception, since the termination of the *one* timber contract could not be seen as "public or general" in its application. *Everett Plywood Corp. v. United States, supra,* 227 Ct.Cl. at 433, 651 F.2d at 734. Further, the court found from the facts of that case that the act in question was neither public nor general—the Government unilaterally terminated that one contract after deciding continued performance would have been unwise. *Everett Plywood Corp. v. United States, supra,* 227 Ct.Cl. at 429, 651 F.2d at 731–32. The Court then stated, in language relied on by the plaintiff, that "(i)t would have been an entirely different case if Congress had passed a law immediately prohibiting all cutting *in all public forests* * * *." *Id.* (Emphasis added.) Since the BWCAW Act terminated only a limited number of timber contracts in a defined geographical area, the plaintiff argues that the *Everett Plywood* court would characterize the BWCAW Act as a nonsovereign act.

 This Court, however, is in agreement with the defendant that national application of a Government policy cannot be seen as a *sine qua non* of a sovereign act. Certainly, given the vast ranges of forest land that the Government owns and administers, the termination of timber contracts within any one forest area must be said to have "public and general" application, even though it does not affect other public timber lands. The terminations pursuant to the BWCAW Act involved herein are illustrative of such a scenario. Furthermore, they affected a number of different contractors over a substantial geographical area. Unlike the sole contractor damaged by the termination in *Everett Plywood,* the plaintiff was not the only party to a Government logging contract who was affected by the enactment of the BWCAW Act. Moreover, in addition to timber contractors, both commercial and recreational

users were affected by the BWCAW Act restrictions.

 Plaintiff also argues that the sovereign act doctrine is applicable only in cases of national emergency. *De Laval Steam Turbine Co. v. United States,* 284 U.S. 61, 52 S.Ct. 78, 76 L.Ed. 168 (1931); *Brooks-Scanlon Corp. v. United States,* 265 U.S. 106, 44 S.Ct. 471, 68 L.Ed. 934 (1924); *Russell Motor Car Co. v. United States,* 261 U.S. 514, 43 S.Ct. 428, 67 L.Ed. 778 (1923). However, while the plaintiff is correct that many of the previous applications of the sovereign act exception by this Court's predecessor have arisen in the context of national emergencies, such a limited application of the doctrine is not acceptable. It is not necessary that such drastic circumstances exist before the United States can be said to have undertaken an act of public and general application in the national interest. Surely, the enactment of legislation intended to preserve federal lands in their wilderness state for future public use and enjoyment must be in the national interest.

 The Government, on the other hand, points to the following language in *Everett Plywood,* concerning the appropriate measure of damages for breach of contract resulting from termination, in support of its position that—"the settlement ought not to differ very widely from the just compensation that would be due for a taking of the contract." *Everett Plywood Corp. v. United States, supra,* 227 Ct.Cl. at 430, 651 F.2d at 732. Thus, even where the Court has found termination of a timber contract to constitute a breach of contract by other than a sovereign act, it has still held that the measure of damages should be equivalent to just compensation as for a taking, rather than common law breach of contract damages. In fact, just compensation is exactly what the BWCAW Act provides for in section 6(b)(2). Therefore, it is necessary to look to the damage provisions of the BWCAW Act to determine what constitutes just compensation.[4]

---

**4.** The plaintiff also attempts to avoid the adverse consequences of application of the sovereign act doctrine by arguing that the BWCAW

Act did not require termination of the plaintiff's timber contract. The plaintiff argues that section 6(a) of the Act required termination only of

## II. *Just Compensation*

Since the sovereign act exception insulates the Government from common law damages for breach, it is necessary to determine what damages Congress has allowed under the BWCAW Act, since it is well established that the United States is not liable for damages resulting from acts performed in its sovereign capacity. *D.R. Smalley & Sons, Inc. v. United States,* 178 Ct.Cl. 593, 597, 372 F.2d 505, 507, *cert. denied,* 389 U.S. 835, 88 S.Ct. 45, 19 L.Ed.2d 97 (1967); *Horowitz v. United States, supra,* 267 U.S. at 461, 45 S.Ct. at 344. Any waiver of sovereign immunity and consent to suit must be clearly expressed and strictly construed. *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 1502, 85 L.Ed. 1058 (1969); *United States v. Sherwood,* 312 U.S. 584, 590, 61 S.Ct. 767, 771, 85 L.Ed. 1058 (1941). Moreover, the claimant, in availing itself of the privilege to sue under the Government's waiver of sovereign immunity, consents to the limitations and conditions applied thereto by Congress. *McElrath v. United States,* 12 Otto 426, 102 U.S. 426, 26 L.Ed. 189 (1880).

It is clear from the BWCAW Act that Congress intended to compensate terminated timber contractors for two elements of damage: (1) just compensation for the terminated contracts, and (2) losses due to costs incurred in directly fulfilling the terms of such contracts. Thus, the plaintiff is limited in its recovery to these two elements of damage.

With regard to the first element—just compensation—the plaintiff argues that, even if the termination of its contract pursuant to the BWCAW Act is seen as a sovereign act, the just compensation afforded terminated timber contractors in the BWCAW Act was intended to include damages for common law breach of contract, including anticipated profits. The defendant counters that anticipated profits are not an element of just compensation.

The "classic" just compensation cases deal with appropriations of tangible property by the Government, especially the taking of land. In this case, however, the property taken was the plaintiff's right to performance under the contract. Thus, it was the contract itself that was the subject of the legislative taking. It is long-established that a contract constitutes property within the meaning of the fifth amendment. *See Lynch v. United States,* 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934).

In *Foster v. United States,* 2 Cl.Ct. 426, 445–46 (1983), a similar case involving the Government's termination of a mining contract, this Court held that:

The fifth amendment provides that private property shall not be taken for public use without just compensation. The guiding principle is to reimburse the owner for the property that was taken, and just compensation means the full monetary equivalent of that property. The owner is to be put in the same position, from a monetary standpoint, as he would have been without the taking; he is to be made whole, but he is not enti-

---

those contracts formerly enjoined by the district court and that the Laurentian sale was not in the area subject to that injunction. Furthermore, the plaintiff argues that the BWCAW Act allowed a one year period to complete harvesting in those areas not subject to the injunction. Therefore, the plaintiff asserts, it should have been allowed to log under its contract during that one year period.

The stated purpose of the BWCAW Act was to preserve, inasmuch as possible, the wilderness state of the BWCAW. Cessation of logging was obviously a necessary step to this end. While the Act allowed for the "completion" of the harvesting of timber during the termination period, the purpose of said termination period was

to permit completion of the harvesting of timber and to permit the taking of ameliorative measures, including land and cover restoration that will, *at the earliest feasible date,* make the imprint of man's work substantially unnoticeable on the lands included as wilderness in the BWCAW.

Clearly, to allow the plaintiff to have initiated logging under the Laurentian contract would have been inimicable to the stated goal of the Act: preservation in a wilderness state in the shortest possible time. There can be no doubt, in view of the clear language of the statute, that the Laurentian contract was properly terminated prior to the commencement of logging operations by Hedstrom.

tled to more. The value of the property taken is not the value to the owner for his particular purposes, and the owner does not necessarily receive compensation for all the value derived from the property. The special value of the property to the owner arising from its adaptability to a particular use is not compensated, nor is the value to the Government for some special use.

The burden of establishing the value of the property taken rests upon the claimant. As a general rule, there is no compensation for frustrated contracts or for loss of future income. The sovereign must pay only for what it takes, not for opportunities the owner loses.

The essential question is always what has the owner lost, with the owner's indemnity measured in different ways dependent on the circumstances of the case. Just compensation invokes the equitable powers of the court and there is wide latitude of judicial discretion to include or exclude particular elements of damage. Although there is wide latitude in selection of a method of valuation, the method selected cannot be so removed from economic reality that it is mere speculation or conjecture. The Supreme Court standard that requires valuation to be based on events that are reasonably probable is stated thus:

> Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable, should be excluded from consideration, for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value—a thing to be condemned in business transactions as well as in judicial ascertainment of truth.

*Foster v. United States, supra,* 2 Cl.Ct. at 445–46.

■ The plaintiff, however, argues that the "unique circumstances" of this case dictate that, in "fairness," it should be compensated for its lost profits. The plaintiff would define just compensation, for purposes of computing damages under the BWCAW Act, as the total benefit that would have been realized by the plaintiff had it been allowed to harvest and process the timber purchased from the Government. The plaintiff argues that its circumstances are unique, because (1) unlike other milling operations, the company's sawmill was located in reliance on a perceived nearly limitless source of supply in the BWCAW area, and (2) the terminated Laurentian contract was unique in the quality of timber to be harvested, resulting in the plaintiff's being unable to cover the termination with the same quality of timber. However, this Court finds that the plaintiff was not so uniquely or egregiously injured that the long line of authority disallowing recovery of lost profits in just compensation cases should be disregarded.[5]

■ Even if the termination of the Laurentian contract can be characterized as a taking of the plaintiff's entire business, the U.S. Supreme Court has held that there can still be no compensation for the destruction of the business. *Mitchell v. United States,* 267 U.S. 341, 45 S.Ct. 293, 69 L.Ed. 644 (1925). In *Mitchell,* the Government condemned certain agricultural property for use as a weapons testing ground. Previously, the land had been used for growing a special corn crop to supply the claimant's canning operation, which could not be grown elsewhere than on the condemned property. Thus, the condemnation occasioned the destruction of the claimant's business. In denying compensation for the taking of the business itself, the Supreme Court held that, since there was no intent on the part of the Government to take the business itself, as distinguished from the

---

**5.** The cases pointed to by the plaintiff in support of its contention that it is entitled to lost profits are inapposite because they involve breach of contract where just compensation has not been designated as the proper measure of damages by the Congress. *Peck Iron & Metal Co. v. United States,* 221 Ct.Cl. 37, 603 F.2d 171 (1979); *Carchia v. United States,* 202 Ct.Cl. 723, 485 F.2d 622 (1973); *J.D. Hedin Construction Co. v. United States,* 187 Ct.Cl. 45, 408 F.2d 424 (1969).

intent to take the land on which the business was conducted, there could be no consequential damages for the destruction of the enterprise. In particular, the Court held that:

> If the business was destroyed, the destruction was an unintended incident of the taking of land. There can be no recovery under the Tucker Act if the intention to take is lacking. *Tempel v. United States,* 248 U.S. 121, 39 S.Ct. 56, 63 L.Ed. 162. Moreover, the Act did not confer authority to take a business. In the absence of authority, even an intentional taking cannot support an action for compensation under the Tucker Act. *United States v. North American Co.,* 253 U.S. 330, 40 S.Ct. 518, 64 L.Ed. 935.

*Id.* at 345, 45 S.Ct. at 294.

The plaintiff finds itself in much the same position as the claimant in *Mitchell.* Here, the Government's desire to preserve and/or restore the wilderness setting required it to terminate the plaintiff's logging contract. The Government's clear intention was to take the contract itself, but not to take and/or destroy the plaintiff's milling operations. If the termination, by removing the plaintiff's source of supply of certain unique timber (principally old growth white pine), had in fact resulted in the destruction of the plaintiff's business, the plaintiff would still not be entitled to compensation for the loss of such business.

■ Therefore, this Court determines that the appropriate standard to be applied in arriving at just compensation is that of replacement value. The plaintiff is to be put in the same position, from a monetary standpoint, as he would have been without the taking. However, the Government is only required to pay just compensation for what it takes. As a result, the plaintiff's claim for anticipated and lost profits is considered to be too speculative to entitle it to such recovery.

### III. *Plaintiff's Damages*

■ In determining the amount of just compensation to which the plaintiff is entitled, this Court must determine the value of the Laurentian contract at the time of the taking. In reaching this determination, the Court must consider two primary factors—(1) the volume of particular species of timber within the Laurentian area, and (2) the price at which such timber can be replaced following the Government's taking of the contract.

■ As regards the volume of particular species of timber, the parties disagree as to whether the volume estimates set forth in the original Laurentian contract should be used to determine the volume of timber available for harvesting in the sale area at the time of the termination of the contract or whether a growth factor should be added to those original figures in order to arrive at an estimate of the timber available at termination.

The plaintiff argues that the volume of white pine and white spruce had increased over that set forth in the original Laurentian contract. Hedstrom's increased volume assessment is the result of a cruise of Block 3 of the Laurentian sale conducted by its expert, Mr. Sidney Rommel, in May of 1982. Mr. Rommel is a retired forestry official with the Minnesota Department of Natural Resources. The volume of timber estimated to have been available on the sale area in 1978 was determined by subtracting a 4 percent growth rate for each year between 1978 and 1982. The 4 percent per year growth rate was an estimate arrived at by Mr. Rommel after comparison of the results of his 1982 cruise with those of the 1974 Forest Service cruise. The 4 percent per year growth rate translates into a 21.6 percent increase in the contract volumes of white pine and spruce. As a result of the significant differences in methodology between the Hedstrom cruise and the Forest Service cruise, the plaintiff would apply the 4 percent growth factor only to the white pine and white spruce in the Laurentian sale. Using the plaintiff's computation of available timber on the sale, the following amounts of timber would have been available:

| Species | Sawtimber (Ccf) | Pulp (Ccf) |
|---|---|---|
| Red and White Pine | 235 | — |
| White Cedar | 17 | — |
| Aspen | 109 | 213 |
| Balsam Fir | 231 | 539 |

| Species | Sawtimber (Ccf) | Pulp (Ccf) |
| --- | --- | --- |
| White Spruce | 225 | 77 |
| Birch | 46 | 161 |
| Total | 863 | 990 |

The Government disputes Hedstrom's calculation of the volume increase for growth of timber on the Laurentian sale. The defendant maintains that: (1) the plaintiff's 1982 cruise data is inaccurate due to a flawed methodology, and (2) the rate of timber growth is so slow as to be offset by mortality, since the timber in the Laurentian sale was overmature. Thus, the defendant relies on the 1974 Forest Service cruise data, incorporated in the Laurentian contract, as an accurate measure of the volume of timber on the Laurentian sale at the time of the cancellation of the contract.

The estimated quantities of merchantable timber included in the Laurentian contract, based on the 1974 Forest Service cruise, were:

| Species | Sawtimber (Ccf) | Pulp (Ccf) |
| --- | --- | --- |
| Red and White Pine | 193 | — |
| White Cedar | 17 | — |
| Aspen | 109 | 213 |
| Balsam Fir | 231 | 539 |
| White Spruce | 185 | 63 |
| Birch | 46 | 161 |
| Total | 781 | 976 |

The defendant's disregard of any allowance for growth cannot be accepted. Although the Government presented evidence indicating that some of the timber on the Laurentian sale was overmature, the bulk of the evidence proved to the Court's satisfaction that the timber (especially the white pine and white spruce sawtimber) was not overmature and declining.

It is the opinion of the Court that the plaintiff's expert witness, Mr. Rommel, presented the more credible evidence concerning the growth factor. Mr. Rommel is a well-qualified forester who has participated in countless timber cruises and growth studies, and who is intimately familiar with the forests of northeastern Minnesota.

Moreover, the Government's lead witness on the growth issue, Mr. Hill, conceded on cross-examination that the white pine timber looked healthy, was not overmature, and was in good shape. Unless the timber on the sale was overmature when the contract was entered into in 1974, there will be some growth resulting in an increased timber volume that must be accounted for in determining just compensation. Since the defendant offered the Court no reasonable growth theory or figure, the Court feels compelled to accept the plaintiff's theory and figures. Moreover, the Court finds Mr. Rommel's 4 percent per year growth increase to be reasonable.

▮▮ The parties also dispute the prices applicable to the various species of timber at the time of the termination. The Government relies on the average bid rates for the various species on the Laurentian sale in the six months preceding passage of the BWCAW Act. *See* 36 C.F.R. Part 223.-9(a)(5)(1982). Those rates were:

| Species | Sawtimber (Ccf) | Pulp (Ccf)[6] |
| --- | --- | --- |
| Red and White Pine | $ 28.13 | — |
| White Cedar | 6.07 | — |
| Aspen | 3.89 | $ 1.35 |
| Balsam Fir | 4.87 | 4.87[7] |
| White Spruce | 13.96 | 10.97 |
| Birch | 2.79 | 0.60[8] |

The above rates differ significantly from those specified in the Laurentian contract for the calculation of the applicable stumpage payments. Those rates were:

| Species | Sawtimber (Ccf) | Pulp (Ccf) |
| --- | --- | --- |
| Red and White Pine | $29.44 | — |
| White Cedar | 1.06 | — |
| Aspen | 1.00 | $1.00 |
| Balsam Fir | 1.03 | 1.03 |
| White Spruce | 6.91 | 6.91 |
| Birch | 0.98 | 0.98 |

6. For purposes of comparison, the price/Ccf is used, but the total stumpage payment used in the calculation of damages, *infra*, is the amount actually due under the contract.

7. The balsam sawtimber and pulpwood prices represent the higher pulpwood rate as there were no sales of balsam sawtimber in the Gun-flint and Tofte Ranger Districts in the six months prior to the passage of the BWCAW Act.

8. While there were no sales of birch pulpwood in the relevant districts during the applicable six month period, the figure of $0.60/Ccf represents the minimum price at which the Forest Service would sell that species at that time.

In order to place the plaintiff in the same position, from a monetary standpoint, as he would have been without the taking, this Court concludes that the average bid rates for the subject timber species in the Gunflint and Tofte Ranger Districts, during the years 1979–1980, should be used. The Court has reached this conclusion based upon its belief that the cost of replacement timber should be calculated at the rate prevailing at the time that such replacement timber would be purchased by the plaintiff, *i.e.*, 1979–1980.[9] Thus, the composite data available for a determination of just compensation is:

| Species | Volume (Ccf) | Price | Total |
|---|---|---|---|
| Sawtimber: | | | |
| Red and | | | |
| White Pine | 235 | $ 33.74 | $ 7,928.90 |
| White Cedar | 17 | 4.42 | 75.14 |
| Aspen | 109 | 4.44 | 483.96 |
| Balsam Fir | 231 | 4.87[10] | 1,124.97 |
| White Spruce | 225 | 14.52 | 3,267.00 |
| Birch | 46 | 4.87 | 224.02 |
| | | | |
| Pulp: | | | |
| Aspen | 213 | $ 2.27 | $ 483.51 |
| Balsam Fir | 539 | 5.47 | 2,948.33 |
| White Spruce | 77 | 11.51 | 886.27 |
| Birch | 161 | 0.98[11] | 157.78 |
| Totals | 1,853 | | $17,579.88 |

Thus, based on the replacement value of the subject timber at the time at which the plaintiff would have been required to replace it, the plaintiff should receive $17,-579.88, less the contractual obligation to pay $8,693.49 for the privilege of cutting the timber. Therefore, just compensation equals $8,886.39, the difference between the objective timber value and the stumpage amount owed the Forest Service.

██ As part of its recovery, the plaintiff also seeks compensation for the loss of bonuses to be paid on pulpwood deliveries to Great Lakes. The bonuses apply to two categories of pulpwood: aspen and soft-wood (Balsam fir and white spruce). The bonus rate, which took effect only after a stated minimum of 800 and 2,000 cords, respectively, were delivered, was $1 and $2 per cord, respectively. The plaintiff argues that the loss of the timber volume associated with the Laurentian contract prevented Hedstrom from reaching the required minimums and thus resulted in the loss of the bonuses. The plaintiff would have the Court add the anticipated volumes from the Laurentian contract to the volumes of pulpwood actually shipped to Great Lakes from other sales in order to exceed the stated minimums and thus trigger the applicable bonuses.

The defendant does not dispute the $1/cord bonus for aspen, but argues that the $2/cord bonus for softwood is inapplicable, since the bonus was added as an amendment to the contract *after* the plaintiff knew that the Laurentian contract could not be logged. The amendment was added by letter dated January 22, 1979, after the plaintiff was informed by the Forest Service in December of 1978 that logging would not be permitted on the Laurentian sale. Moreover, formal notification of the termination of the contract was made on January 16, 1979. The defendant's point, therefore, is well taken that the plaintiff could not have reasonably expected the anticipated volume from the Laurentian sale to be included in the volume minimums with regard to softwood. As a result, the plaintiff is not entitled to recover the $2/cord bonus as part of its just compensation.

██ In any event, as previously noted, just compensation does not include anticipated profits. *Foster v. United States, supra,* 2 Cl.Ct. at 445. More generally, "under federal law, there can be no recov-

---

9. This information is contained in plaintiff's Exhibit No. 25.

10. The balsam sawtimber and pulpwood prices represent the higher pulpwood rate as there were no sales of balsam sawtimber in the Gunflint and Tofte Ranger Districts during the years 1979–1980. The appropriateness of using these figures has been conceded by the Government in its own argument.

11. Since there were no sales of birch pulpwood, the Court must utilize either the Government's $0.60/Ccf figure or the contract price of $0.98/Ccf. In view of this lack of evidence, the Court feels compelled to adopt the contract price of $0.98/Ccf as the more appropriate figure.

ery for consequential damages as a result of a taking." *Mitchell v. United States, supra,* 267 U.S. at 345–46, 45 S.Ct. at 294. Plaintiff argues that the alleged loss of the bonus payments provided for in the plaintiff's contract with Great Lakes resulted from the defendant's termination of the Laurentian contract. Such consequential damages are, however, simply not compensable under a theory of just compensation. Consequently, the plaintiff is not entitled to any damages as to the $1/cord or $2/cord bonus.

 In addition to the $8,886.39, allowed for timber replacement, the plaintiff is also entitled to a reasonable figure for the increased hauling or transportation expenses necessary to bring the replacement sawtimber to the plaintiff's sawmill. In order to make the plaintiff whole, it must be compensated for this increased expense.

 The evidence is clearly supportive of the plaintiff's contention that the passage of the BWCAW Act reduced considerably the amount of timber—especially white pine—available to commercial sawmills in northeastern Minnesota. The plaintiff was hit especially hard by the BWCAW Act, because it closed to logging significant portions of the Gunflint and Tofte Ranger Districts, which were the ranger districts closest to the plaintiff's mill. Thus, after 1978, the plaintiff was forced to roam considerable distances away from its sawmill to locate its sawtimber supply—especially for white pine sawtimber. The plaintiff's general manager, Mr. Wesley J. Hedstrom, testified that the plaintiff had gone as far away as Orr, Minnesota, some 165 miles away from Grand Maris, in order to obtain suitable white pine sawtimber.

In view of the lack of evidence on this issue, the Court determines that the plaintiff can secure replacement sawtimber within a 50-mile radius beyond that of the Laurentian sale. While the evidence indicates that the plaintiff, on at least one occasion, was forced to travel 165 miles to Orr, Minnesota, in order to obtain sawtim-

ber, the Court believes that this distance represents the outer limits to which the plaintiff would have to travel in order to obtain the replacement sawtimber. As a result, the Court concludes that a 50-mile radius beyond that of the Laurentian sale represents a reasonable distance within which the necessary replacement sawtimber will be available. Since the hauling will involve expenses for the transportation of the replacement sawtimber from the replacement site to the plaintiff's mill and back, 100 miles per round-trip load will be allowed. The plaintiff has estimated that such 100 mile round trip will cost $6,757.[12] Since the Government has failed to refute the plaintiff's formula used in computation of this amount, $6,757 will be allowed, reflecting the added transportation expense which the plaintiff will incur in transporting the replacement sawtimber for a distance of 50 miles beyond that of the distance to the Laurentian sale. No additional amounts will be allowed for transporting the replacement pulpwood, since the evidence of record made it abundantly clear that pulpwood sales were readily available within the Grand Marais vicinity.

Thus, Hedstrom is entitled to $15,643.39 as just compensation for the Government's taking of the Laurentian contract.

## IV. *Losses Due to Costs Incurred in Directly Fulfilling the Terms of the Contract*

Apart from just compensation for the plaintiff's losses, section 6(b)(2) of the BWCAW Act also provided that "losses due to costs incurred in directly fulfilling the terms of such contracts shall be paid by the United States * * *." The greatest costs incurred by Hedstrom in fulfilling the terms of the Laurentian contract were those associated with the construction and reconstruction of forest roads. The Government concedes that the plaintiff is entitled to recover the cost of that construction and admits that the plaintiff completed 88 percent of the required road construction before the contract was terminat-

---

12. *See* Plaintiff's Exhibits 3 and 21.

ed. The Government argues, however, that the plaintiff is limited in its recovery to 88 percent of the $2,883 purchaser credit available under the contract. The Government would thus limit the plaintiff's recovery of its road construction costs to the sum of $2,530.

The plaintiff, pointing to the language of the BWCAW Act, argues that the "costs incurred" are the actual costs of construction and are not limited by the contractually agreed upon purchaser credit. At trial, the plaintiff presented evidence of its actual costs of construction, relying primarily upon the estimates of what would have been charged by independent contractors. Thus, the hourly rates presented in the plaintiff's claim represent the rates charged by independent contractors for the work the plaintiff in fact performed itself. The plaintiff seeks recovery of its actual road costs, amounting to $4,566.15.

■■■ While generally a contractor's compensation for road construction costs under a timber contract is limited to the agreed upon purchaser credit contained in the contract, this Court finds that, in order to make the plaintiff whole, he is entitled to recover his actual costs in constructing the road. If the Government had not taken the plaintiff's contract, the difference between the purchaser credit and the actual construction cost would have been recouped by the plaintiff out of any realized profits on the sale of the lumber. Here, since the plaintiff will be unable to recoup these expenses out of the future profits from the contract, he is entitled to recover $4,566.15 as his actual costs. In addition, there is evidence in the record that the original estimate by the Forest Service as to the purchaser credit may have been unreasonably low, since considerable hard mantle rock was encountered during construction of Forest Road 1415 and considerable extra work was necessary to complete culvert work on Forest Road 317.

Other costs incurred by the plaintiff in fulfillment of the contract include a $100 deposit on the Laurentian contract and a one-year performance bond at a cost of

$25. The defendant concedes the plaintiff's entitlement to these two items.

Therefore, the plaintiff is entitled to recover $4,691.25 as its actual costs incurred in directly fulfilling the terms of the Laurentian contract.

### V. *Interest*

■■■ It is well established that an award of "just compensation" under the fifth amendment entitles the owner whose property is taken to receive interest from the date of taking to the date of payment as part of such just compensation. *United States v. Thayor-West Point Hotel Co.,* 329 U.S. 585, 588, 67 S.Ct. 398, 399, 91 L.Ed. 521 (1946); *Miller v. United States,* 223 Ct.Cl. 352, 399, 620 F.2d 812, 837 (1980); *Jones v. United States,* 3 Cl.Ct. 4, 7 (1983).

In *Cloverport Sand & Gravel Co. v. United States,* No. 344–77, 6 Cl.Ct. 178 at 203 (1984), this Court held that:

The plaintiff is also entitled to receive interest as part of the just compensation on this amount from the date of the taking until the date of payment by the defendant. * * * This Court's predecessor court, the United States Court of Claims, adopted a 7.5 percent rate of interest for the period of 1971 through 1975, *Miller v. United States,* 223 Ct.Cl. 352, 406, 620 F.2d 812, 841 (1980), and an 8.5 percent rate for the period 1976 through 1979. *Id.* In *Foster v. United States,* 3 Cl.Ct. 738 (1983) (*Foster III*), Judge Harkins observed that the Contract Disputes Act provides for the payment of interest on successful contract claims at a rate to be established by the Secretary of the Treasury pursuant to Pub.L. No. 92–41, 85 Stat. 97. *Id.* at 745; *see* 41 U.S.C. § 611 (1982); *see also Jones v. United States,* 3 Cl.Ct. 4, 7 (1983). These rates are:

| | |
|---|---|
| Jan.—June 1980 | 12¼ percent |
| July—Dec. 1980 | 10½ percent |
| Jan.—June 1981 | 14⅝ percent |
| July—Dec. 1981 | 14⅞ percent |
| Jan.—June 1982 | 14¾ percent |
| July—Dec. 1982 | 15½ percent |
| Jan.—June 1983 | 11¼ percent |
| July—Dec. 1983 | 11½ percent |

Jan. —June 1984 12⅜ percent
July—Dec. 1984 14⅜ percent

Judge Harkins determined that "[f]or purposes of uniformity in compensation of claims against the Government, flexibility in administration, notice to the public, and judicial efficiency, rates established under the method required in the Contract Disputes Act are * * * appropriate for computation of just compensation in this taking case * * *." 3 Cl.Ct. at 745. This Court agrees that a uniform method of establishing interest rates is preferable to an ad hoc, case-by-case evaluation.

■ This Court adopts the reasoning as expressed above. The application of interest rates established under the method provided for in the Contract Disputes Act of 1978, 41 U.S.C. §§ 601 *et seq.*, provides for uniformity in compensation, notice to the public, and judicial efficiency. These rates are thus determined to be appropriate for computation of just compensation in this case for the period commencing January 1, 1980. Interest prior to that date, computed from the date of taking, January 16, 1979, shall be computed at a rate of 8.5 percent— the rate established by the Court of Claims for the period 1976–1979. *Miller v. United States, supra*, 223 Ct.Cl. at 406, 620 F.2d at 841.

### VI. *Attorney Fees and Costs*

■ In its complaint, the plaintiff also seeks an award of costs and attorney fees. However, since the plaintiff's property was appropriated through the exercise of a legislative taking, it is not entitled to attorney's fees and costs pursuant to the Uniform Relocation Act, 42 U.S.C. § 4654 (1976). *Rocca v. United States*, 205 Ct.Cl. 275, 500 F.2d 492 (1974); *Georgia-Pacific Corp. v. United States*, 226 Ct.Cl. 95, 640 F.2d 328 (1980). On the other hand, if the plaintiff wishes to continue its pursuit of attorney's fees and expenses pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 (1982), it may file an application for its litigation fees and expenses not later than thirty (30) days after the date of this opinion. *See* RUSCC 81 and Appendix E. *See also Laboratory Supply Corp. of America v. United States*, 5 Cl.Ct. 28 (1984); *Alger v. United States*, 3 Cl.Ct. 246 (1983).

### CONCLUSION

Plaintiff is entitled to $15,643.39 plus interest as just compensation for the termination of the Laurentian contract on January 16, 1979, pursuant to section 6(b)(2) of the BWCAW Act. In addition, the plaintiff is entitled to $4,691.15 as compensation for its costs in directly fulfilling the terms of the terminated contract. Interest due as just compensation is simple interest computed as discussed in section V of this opinion.